State v. Sykes.

---

## THE STATE v. BRUCE SYKES, Appellant.

### Division Two, November 21, 1905.

1. **JUROR: Competency: Opinion: Newspaper Reports.** A juror who states on his *voir dire* examination that he has formed and expressed an opinion as to the guilt or innocence of the accused and that the opinion has been formed from rumor or newspaper reports, and that it will require evidence to remove it, is not incompetent, provided it appears to the satisfaction of the court from the juror's whole examination, including his demeanor while on the witness stand, that such opinion will readily yield to the evidence, and that the juror can give the accused a fair and impartial trial.

2. **CONSPIRACY: How Shown.** It is not necessary that a conspiracy to commit a crime be proved by express agreement, but it may be shown by facts and circumstances from which it may be inferred.

3. ———: **Joining Parties in Information.** It is not necessary that both parties to a conspiracy to commit a crime should be charged in the information with the crime in order to the introduction of evidence showing that a conspiracy actually existed.

State v. Sykes.

4. ————: Information: Aiding and Abetting. Nor, in such case, is it necessary to charge the defendant with being present, aiding, abetting and assisting the other party in the commission of the crime. A party may be charged with doing the act himself· and be held liable, under such charge, for being present, aiding and assisting another in doing it.

5. ————: Assault With Intent to Rape: Sufficiency of Evidence. The evidence in this case is examined, and *held* sufficient to establish a conspiracy between defendant and another party to commit an assault upon the prosecutrix for the purpose of having carnal connection with her.

6. PRACTICE: Evidence: Objection Too Late. A party cannot sit by during the examination of a witness by the adverse party, and before interposing an objection to a question wait until the witness answers, and, if the answer suits him, whether the question be proper or not, accept it, and, if it does not suit him, object.

7. ————: ————: Improper Answer to Question. If the answer to a question be objectionable as not being responsive to the question, the proper course is to ask the court to exclude it at the time or to instruct the jury to disregard it; and when the adverse party fails to do either, he will not afterwards be heard to complain.

8. ————: ————: Incompetent: Non-Prejudicial. While the testimony of the mother of defendant's accomplice that she had never heard of her son since shortly after the commission of the crime, was incompetent and not binding on defendant, and the objection thereto should have been sustained, its admission could not have prejudiced the rights of defendant, and did not constitute reversible error.

9. RAPE: Evidence: Conspiracy: Res Gestae. The evidence showed that defendant, while driving in a buggy with the prosecutrix, began to take improper liberties with her; that she jumped out of the buggy and ran on ahead; that another party came up, threw prosecutrix down, and ravished her, defendant standing by and witnessing the crime, without in anyway assisting prosecutrix in her efforts to resist her assailant; and that after the other party had accomplished his purpose, defendant also assaulted and ravished the prosecutrix. *Held*, that, though there were two separate rapes upon prosecutrix, but one crime was committed, and defendant was properly charged, tried and convicted as principal in the first degree, and each of the acts of ravishment constituted a part of the crime, and it was competent to prove both against defendant as parts of the *res gestae*.

10. ———: **Prosecutrix as Witness: Interest: Instruction.**    An instruction in a prosecution for rape should not tell the jury that the prosecuting witness has no interest in the case other than that of a witness, but where such instruction is qualified by another which says, substantially, that the fact that she is the prosecuting witness should be taken into consideration in determining the weight and credibility to be given to her testimony, there is no ground for complaint.

Appeal from Lewis Circuit Court.—*Hon. E. R. McKee,* Judge.

AFFIRMED.

*Dowell & Simpson, Charles D. Stewart, Hilbert & Hilbert, B. L. Anderson, W. A. Mussetter* and *Smoot Boyd & Smoot* for appellant.

(1)   A challenged jurror cannot pass on his willingness to be fair and impartial and thus qualify himself.   State v. Foley, 140 Mo. 612.   And a juror is disqualified who would require the defendant to prove his innocence.   Such additional burden, which the law does not impose, cannot be imposed to satisfy the whim of a juror.   State v. Bauerle, 145 Mo. 16; State v. Bryant, 93 Mo. 279.   (2)   It was not proper to admit the evidence of the alleged admission of Sykes as against Byers; and then to show the independent acts of Byers as to his flight as against this defendant, and then on this showing to assume a conspiracy and give instructions on the guilt of Byers as principal rapist and this defendant as an accessory principal.   State v. Barham, 82 Mo. 73; 12 Cyc. 441; State v. Weaver, 165 Mo. 7; State v. Minton, 116 Mo. 615; State v. Harris, 150 Mo. 61; State v. Melrose, 98 Mo. 597; State v. Daubert, 42 Mo. 240; State v. Duncan, 64 Mo. 266; State v. Stair, 87 Mo. 275.   (3)   On one count the defendant was tried as shown by the evidence and the instructions for two crimes—that of aiding Ben Byers to commit rape on the prosecutrix, and also for committing rape himself

later—and was found guilty by a general verdict.   (a) On this state of facts we insist that the defendant was not informed of the nature and the cause of the accusation against him.  Const., art. 2, sec. 22; R. S. 1899, sec. 2535; State v. Terry, 109 Mo. 601; State v. Hayward, 83 Mo. 305; State v. Burke, 151 Mo. 143; State v. Daubert, 42 Mo. 246.   (b)   As defendant was tried for two offenses and the jury returned a general verdict, he was thereby found not guilty of being accessory-principal to Byers and guilty of the rape himself, or he was acquitted of the rape himself and found guilty of aiding Byers; but which is which will forever remain a mystery.   He can neither plead *autrefois convict* or *autrefois acquit,* or secure a pardon, for it is impossible to tell of what he has been convicted.  State v. Pierce, 136 Mo. 40; State v. Nitch, 79 Mo. App. 102; State v. Burke, 151 Mo. 146.   (4)   The mere fact that Sykes was near when the unknown person raped the prosecutrix does not make him an accomplice and warrant the court in his instructions to find him guilty as though he were a principal.  He must by words or actions lend aid or encouragement.  State v. Valle, 164 Mo. 551; State v. Orrick, 106 Mo. 120; State v. Cox, 65 Mo. 33; State v. Walker, 98 Mo. 104; State v. Boatright, 182 Mo. 46.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1)   It was not necessary for Ben Byers to be jointly indicted in order for the State to prove a conspiracy between him and defendant.  State v. Boatright, 182 Mo. 46; State v. Orrick, 106 Mo. 119.  Neither was it necessary to charge defendant with being present, aiding, abetting and assisting Byers in the commission of the crime.  "A party may be charged with doing the act himself and be held liable under such charge, for being present, aiding and assisting another in doing it."   State v. Valle, 169 Mo. 551; State v.

191 Sup—5

Orrick, supra; Roscoe's Crim. Evidence, sec. 902. (2) The State contends that only one crime was committed, although there were two separate and distinct acts of rape done—one by Byers, aided by defendant, the other by defendant. Both of these acts constituted a part of this transaction and crime, and it was competent and proper to prove both against defendant as part of the *res gestae.* 1 Bish. Crim. Proc. (3 Ed.), secs. 1085, 1125; State v. Duffy, 124 Mo. 1; State v. Wilkins, 66 Vt. 1. Under our criminal code all distinctions between principal and accessories before the fact have been abolished. An accessory before the fact can be indicted and convicted as a principal. R. S. 1899, sec. 3944; State v. Frederick, 85 Mo. 145; State v. Davis, 29 Mo. 391; State v. Ross, 29 Mo. 32; State v. Rooker, 93 Mo. 88; State v. Payton, 90 Mo. 220; State v. Anderson, 89 Mo. 312; State v. Gooch, 105 Mo. 392. (3) It was not necessary for the information to charge defendant and Ben Byers jointly; the charge against defendant alone was sufficient to justify the admission of evidence tending to prove that defendant was guilty of rape, and also evidence tending to prove that he aided and assisted Byers in the commission of said crime. Instructions on both theories were properly given, and the evidence justified both instructions. State v. Orrick, 106 Mo. 124; State v. Minton, 116 Mo. 613; Kelley v. People, 55 N. Y. 576; Whart. Crim. Law (9 Ed.), sec. 1398; Whart. Crim. Ev., sec. 298; 2 Bish. Crim. Proc., sec. 227; Reinhold v. State, 130 Ind. 467; Com. v. Smith, 163 Mass. 417; Archer v. State, 106 Ind. 432; Reg. v. Fellows, 19 U. C. Q. B. 57; United States v. Cassidy, 67 Fed. 702; State v. Walker, 98 Mo. 104. "Where the accessory is tried alone before conviction of the principal, and when confederacy between the two has been shown, acts and conduct of the principal, immediately following the commission of the offense, and tending to show that he committed it, are competent evidence to prove their common guilt." Wharton's Crim. Evidence (9 Ed.), sec.

702; Levy v. People, 80 N. Y. 338; State v. Rand, 33 N. H. 224. (4) The evidence fully warranted the verdict, and defendant was fortunate in receiving such a light sentence. State v. Sanford, 124 Mo. 484; State v. Miller, 111 Mo. 542; State v. Wilcox, 111 Mo. 573; State v. Yocum, 117 Mo. 622.

*R. B. Noel* and *O. C. Clay* also for the State.

"It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to bias or prejudice the mind of the juror, he may be sworn." R. S. 1899, sec. 2616; State v. Walton, 74 Mo. 284; State v. Care, 70 Mo. 493; State v. Duffy, 124 Mo. 8; State v. Cunningham, 100 Mo. 388; State v. Wilson, 85 Mo. 140; State v. Hopkirk, 84 Mo. 283; State v. Rose, 32 Mo. 354; State v. Reed, 137 Mo. 131; State v. Brennan, 164 Mo. 507; State v. Davis, 29 Mo. 397; State v. Gartrell, 171 Mo. 506; State v. Taylor, 134 Mo. 141; State v. Robinson, 117 Mo. 659; State v. Shackelford, 148 Mo. 495; State v. Hunt, 141 Mo. 630; State v. Bryant, 93 Mo. 280; State v. Burns, 85 Mo. 49.

BURGESS, P. J.—On the 21st day of June, 1904, the defendant was convicted of rape upon the person of one Alice J. Wood, and his punishment fixed at twelve years' imprisonment in the State penitentiary, under an information theretofore filed by the prosecuting attorney of Lewis county with the clerk of the circuit court of said county, charging that defendant, in said county, on the 28th day of June, 1903, in and upon one Alice J. Wood, unlawfully, violently and feloniously did make an assault, and her, the said Alice J. Wood, then and there unlawfully, forcibly and against her will, feloniously did ravish and carnally know, against the peace and dignity of the State.

After unavailing motions for a new trial and in arrest of judgment, defendant appealed.

The facts are substantially as follows:

On Saturday evening, June 27, 1903, there was a festival at Salem schoolhouse in Lewis county. The night was dark, but light enough to see a short distance. Ben Byers attended said festival in an old buggy with a dark red running-gear, drawn by a sorrel horse. He took two small children with him, a nephew and niece, to the festival early that evening, returning with them to his mother's house, and then, about eight o'clock, went back to the festival. What time he afterwards returned home is not shown by the evidence, but his mother did not call him till dinner-time on Sunday, when he came downstairs from his bedroom, accompanied by the defendant. The schoolhouse alluded to was distant some two miles from the Byers home.

The defendant attended said festival in a two-horse buggy. About eleven o'clock Ben Byers made an engagement to take Miss Anna Wilson home from the festival, but afterwards asked to be excused for the reason, as he stated, that defendant was going home with him to stay all night; and besides Miss Wilson had decided to go to another place, which lay in another direction from the schoolhouse. The prosecuting witness was at said festival and met the defendant there. She had only met him once before, in January, 1903, at a ball in Lewiston. Miss Wood attended the festival in company with her cousin, John Browning, arriving at the schoolhouse about nine o'clock. Defendant, who was then nineteen years old, asked the prosecutrix for her company home at about eleven o'clock. She declined, saying that she had come there with her cousin. Defendant replied, "He don't care; we will see him." He then took her out to supper and on the way met her cousin. She asked her cousin if he cared whether defendant took her home, and he replied that he did not. Defendant and the prosecutrix had supper and then

started together toward her home, riding in a one-horse buggy. On the way defendant made attempts to put his arm around her and kiss her, she objecting all the time. Defendant insisted that she did not care if he caressed her, and she insisted that she did. As they neared Mr. Fishback's defendant discontinued his efforts, and did not again molest her till they had passed that residence and were near what was called the "troublesome bridge," about four miles from the schoolhouse in Lewis county. Defendant looked back two or three times and then pulled up her dress and felt of her leg. She objected, jumped out of the buggy and commenced running away from him. After going a little distance she looked back and saw defendant and another man following her. They overtook her, the defendant taking hold of her left arm and the stranger of her right arm. She commenced screaming, and this other person told her to hush. Defendant shook a handkerchief in her face a time or two. The other man tripped her and threw her down, pulled up her clothes and ravished her. Defendant was on the ground close to her feet, and when called upon by the prosecutrix to help her, the stranger told him to stand back or he would shoot him. After this unknown man had accomplished his fiendish work, he left and the prosecutrix tried to get up; but the defendant grabbed her, pushed her back on the ground, pried her legs apart and got on her person, and she felt his private parts touch her private parts. She then and there became unconscious. This other man, who was doubtless Ben Byers, and who was described by her as a broad-shouldered man with thick arms and hands, had come up from behind the prosecutrix on the road and was driving a two-horse buggy. When the prosecutrix regained consciousness she was in the buggy with defendant, and the buggy went into a ditch. This aroused her, and she jumped out of the buggy and ran in the direction of where she heard some dogs barking, and presently came to the house of Mr.

McGovern. As she ran she heard the defendant say that the buggy was broken all to hell. At Mr. McGovern's house she asked Sherman McGovern to go with her to hunt her cape and to go home with her, which he did. As soon as she reached home she told her mother what had occurred, and on the next day (Monday) she and her father made complaint to the prosecuting attorney. The drawers, underskirt and waist of the prosecutrix were offered in evidence. The waist was torn in the back and sleeve, and the buttonholes of the skirt torn apart and the garment otherwise injured. All of said garments were covered with mud and the drawers and underskirts had blood on them. Prosecutrix testified that she resisted the defendant and the other man and fought them as well as she could.

Sherman McGovern testified that he saw the prosecutrix after midnight that night at his father's house; that her hair hung down around her shoulders; that the back of her dress was stained with dirt and her dress torn at the waist; that she looked scared, was crying and asked for some one to take her home. She stated that she had been to Salem schoolhouse to a supper and was going home with the defendant and that the buggy ran into a ditch and upset. On the way home with her, this witness noticed a two-horse buggy standing in the road. As soon as prosecutrix saw the buggy she said, ''There he is again,'' and stepped behind the witness and started to run. After leaving her at her home, this witness went down to where she said the buggy had run into the ditch. There he found a lady's handkerchief, which belonged to the prosecutrix; also a lap robe, a buggy whip and a piece of a buggy step. Witness examined the ground and saw buggy tracks leading into the ditch and noticed where they turned around and came back. He found another buggy track and followed it up to near the said ''troublesome bridge,'' where it led up close to a fence by the side of the road. The track was a fresh one, and the buggy had been drawn by two horses.

There was timber growing on either side of the road near this bridge. Some fifty or sixty yards from the bridge witness saw a place that "looked like it had been wallered in by humans." While the prosecutrix made no accusation against any one in the presence of witness, still he thought she had been mistreated some way. The "wallered" place was west of the bridge, and the buggy tracks which he found by the side of the fence were west of that.

Mr. Fishback testified that he and his family attended this festival and returned home between twelve and one o'clock. While he was unhitching his team he heard some one hollow down near the bridge; it was a rather fine voice.

Mrs. Wood, mother of the prosecutrix, testified that her daughter attended the festival in a one-horse buggy in company with her cousin, John Browning, her brother going with them, but riding a pony. The two boys returned about midnight, but her daughter came back with Sherman McGovern at two o'clock. As soon as she saw her daughter, the mother noticed that her hair was all down and her clothes torn and bloody and that she was nervous and sick. She made complaint then and there to her mother that Bruce Sykes and a stranger had ravished her. On examination, the mother found her daughter's arms bruised, her legs swollen, and parts bloody. Witness said that the blood was not caused by the daughter's monthly period.

Mrs. Robinson testified that she was at the Wood home on the Monday after the festival, and that she examined the prosecutrix. She found bruised places on her arms, legs and neck, and her parts swollen and inflamed. Her mental condition that day was unusual; she was crying and screaming. The witness further testified on cross-examination that the prosecutrix told her that her father was away from home Sunday, and that she felt so bad she didn't know what to do; so she went over to her aunt's that day.

Frank Ewalt, deputy sheriff of Lewis county, identified the step, lap robe and buggy whip which he got from Sherman McGovern at the home of John McGovern shortly after the trouble. He also testified that on July 11, 1903, a warrant was placed in his hands for the arrest of defendant and Ben Byers. After visiting defendant's home and the Byers home and making inquiries for them, he failed to find either one. Witness took the broken buggy step and found that it fit upon a buggy with a red running-gear which he discovered in Mrs. Byer's barn, which buggy had a step broken off.

J. D. Johnson testified that he was sheriff of Lewis county, and that a warrant for the arrest of defendant was delivered to him on July 10, 1903. After making trips to various places, and sending out a number of letters and telegrams, he heard from J. D. Rizor, a deputy sheriff, that defendant was near Spearfish, South Dakota. He telegraphed Rizor to arrest him, and defendant was arrested on August 4. While on the way to Missouri the sheriff asked the defendant if he saw Ben Byers rape the girl, and his reply was, "No, it was so dark I could not see whether he raped her or not."

W. A. Rizor, deputy sheriff of Spearfish, South Dakota, testified that he arrested defendant on a ranch in his county on August 4, 1903; that defendant was known there by the name of Jack Wilson and that he (defendant) denied knowing any man named Byers. Defendant afterwards admitted to him that he took a girl home from a school entertainment and that he arranged with Byers to take his buggy; that Byers passed him (defendant) on the road, tied his team and came back, and that by that time he had the girl out of the buggy and was trying to "do business" with her. The girl resisted him, saying that she would rather walk than do anything of that kind; that Byers came up and grabbed the girl and she began screaming, and that Byers threw her down and did business with her. That he, the defendant, then came up and acted like he was going to

help her, but that Byers cursed him and told him to stand back, or he would kill him; that when Byers got through and left, he then came up and took hold of the girl and spoke to her about doing business with her; that the girl said that he could not treat her as mean as that other fellow did, but he, defendant, said, "Under the circumstances you can't well deny me." That the girl said no more, and he then laid her down and did business with her; that they both got up, got in the buggy and rode till they drove over a rock and upset the buggy and both fell out; that the girl then went over to a neighbor's house, and he stayed all night with Byers.

It was admitted and proven in open court that the defendant testified at former trials that he made an arrangement with Ben Byers on the evening of June 27, 1903, to exchange his team and buggy for Byers' buggy and horse; that defendant was to turn the horse into the pasture and leave the buggy there on the same night on which he exchanged buggies with Byers at the home of Mrs. Byers.

B. L. Gridley testified that he was the official reporter of the court, and took down defendant's testimony at a former trial. That defendant then testified that on that night he got a one-horse buggy with red running-gear, drawn by a sorrel horse, from one Ben Byers; that he put his arm around the prosecutrix and kissed her after they had passed Fishback's house, but that he had no wrong purpose in his mind and heart; that he put his hand on her leg, but that he did so without any evil purpose.

Dr. J. C. Brown testified that on August 9, 1903, he examined the prosecutrix and found the hymen perforated and torn aside; that it had been penetrated and had not sloughed off by disease.

Other witnesses testified that Ben Byers was between twenty-five and thirty years old, weighed one

hundred and eighty pounds, had a thick neck, big hands and arms, and was very stout and well muscled.

On behalf of defendant John McGovern testified that on Monday after this trouble he saw a buggy track leading into his field and saw where it turned around and went out the same gate. He noticed tracks in a ditch near where the buggy was supposed to have been broken.

C. J. Kendrick testified that he heard of defendant's trouble, advised him to leave, and assisted him to do so. Witness saw defendant twice after the trouble, but defendant said nothing to him about it. Finally he went to see defendant, but learned that he was at John Brown's some fourteen miles away, in Shelby county. After going to Brown's the witness saw defendant and advised him to leave and bought him a railroad ticket from Shelbina to Spearfish. He drove a buggy and horse to Shelbina and left on the 11 p. m. train. The defendant's father returned witness the amount of cash he had advanced defendant.

Defendant testified that he first met the prosecutrix at a ball in Lewiston, in January, 1903, and next met her at the ice cream supper at Salem schoolhouse. It was nearly eleven o'clock when he took her out to supper that night; that it was arranged for defendant to take her home instead of her cousin, and that defendant exchanged his buggy for Ben Byers' buggy. He denied looking back on the way home, but admitted putting his arm around prosecutrix and kissing her, she making no objections. He also pulled up her dress and felt of her leg, but that he did not mean anything by it; that prosecutrix became somewhat indignant at his actions and jumped out of the buggy; that he did not mean to insult her and he got out of the buggy to try to get her to come back, but that she refused to ride further with him. That just then some man passed and she began screaming for help, but the man threw her down; that he came up and tried to interfere, and the

man cursed and threatened to kill him; that it was dark, and he could not tell whether the man raped her or not; that he could not tell who the man was; that he helped prosecutrix into his buggy and started on home and that she told him that she did not blame him for what had occurred; that presently the buggy went into a ditch and upset; that both of them fell out, and prosecutrix ran off and he did not see her any more; that he went on to Ben Byers' home, unhitched the buggy and went to bed in the same room with Ben Byers. Defendant denied making the statement attributed to him by witness Rizor and also denied having sexual intercourse with the prosecutrix. He further testified that Rizor said he would put defendant where no man would ever find him for two hundred dollars.

P. N. Graves, a justice of the peace, testified that the first affidavit filed with him charged the defendant with assault with intent to rape.

The State, in rebuttal, also proved the good reputation of prosecutrix for chastity and virtue and for truth and veracity, and the same was expressly admitted by defendant. Evidence in rebuttal was also offered by the State to show that John Browning, cousin of prosecutrix, who took her to the festival, in returning home therefrom drove into the field by mistake and turned, around and came back, which tends to contradict defendant's statement that he drove into this field while on his way home from the festival with prosecutrix.

The first question presented for consideration by this appeal is as to whether the court erred in overruling defendant's objections to twenty-three men summoned as members of the panel of jurors, upon the ground that they were all shown on their *voir dire* examination to be incompetent and disqualified to sit as jurors upon the trial of the cause. Under the statute (sec. 1837, R. S. 1899) defendant was entitled to a panel of forty qualified, impartial jurors from which to make his selection of twelve to sit in judgment upon the case.

The objection to these jurors was upon the ground that they had formed and expressed opinions as to defendant's guilt, and were incompetent to sit as jurors in the cause under the provisions of section 2616, Revised Statutes 1899, which provides: "It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn."

Of the challenged jurors, J. W. White, M. B. Hubbard, W. C. Turner and A. A. Turner were passed without objection. As a rule the other jurors had formed or expressed an opinion founded on rumor or newspaper reports, many of the jurors not even knowing the prosecuting witness or the defendant, but they invariably stated that they would be governed by the evidence in the case and could and would give the defendant a fair trial if selected to sit as jurors in the case. There seemed to be an effort upon the part of defendant's counsel to confuse the jurors by improper or misleading questions touching their qualifications, so that the answers in several instances seem absurd; but they all stated that they were not prejudiced against the defendant and could give him a fair trial. It is true some of them said they were prejudiced against this kind of case or crime, but not against a man charged with such crime before being proven guilty. It was held in State v. Bryant, 93 Mo. 273, and in State v. Williamson, 106 Mo. 162, that persons who have formed opinions of the guilt of an accused upon trial for crime, from rumor or newspaper reports, are not for that reason rendered incompetent to sit as jurors on the trial of the case, where they answer upon their *voir dire* that they can give the defendant a fair and impartial trial. [State v. Duffy, 124 Mo. 1.] A juror who states on his *voir dire* examination that he has formed and expressed an opin-

ion as to the guilt or innocence of the accused and that
the opinion has been formed from rumor or newspaper
reports, and it will require evidence to remove it, is
not incompetent, provided it appears to the satisfac-
tion of the court that such opinion will readily yield to
the evidence in the case and that the juror will deter-
mine the issues upon the evidence adduced in court,
free from bias. It is said in State v. Cunningham, 100
Mo. 382, that all doubts should be resolved in favor of
the finding of the trial court, and the question of the
qualification of the juror must be determined from his
whole examination, including his demeanor while an-
swering questions under oath touching his qualifica-
tions as a juror. Two of the jurors answered that their
opinions were such as would require evidence to re-
move, and that defendant would have to prove his in-
nocence, but such answers were brought out by cun-
ningly framed questions, and they thereafter stated that
they could give the defendant a fair and impartial trial.
In the case of State v. Cunningham, supra, BLACK, J.,
speaking for the court, said: ''Moreover, the question
as to the qualification of the juror must be determined,
not from a few catch-words drawn from him by a series
of questions, but from his whole examination, including
his demeanor whilst on the witness stand. When he
says he would have a prejudice and bias which it would
take evidence to remove, and the defendant would have
to prove his innocence, he is evidently speaking of the
case on the supposition that the circumstances as stated
in the newspaper reports should turn out to be true.
His attention is called to the newspaper account, his
opinion thereon, and then the direct and leading ques-
tions are asked which bring out the statements. When
he is given an opportunity to make a full explanation,
it appears he has no bias at all. He understood it to be
his duty to disregard the newspaper reports, and this
he says he could and would do. His notions of the case
were nothing more than such as any one would form

from reading a newspaper report, and it is but common information that such reports have little or no influence upon a fair-minded man when he is called upon to determine the fact in the light of evidence given under oath. If such a juror is to be rejected it must be because he is an intelligent, honest, fair-minded man, and not because he has any opinion which would in the least sway his mind from an impartial consideration of the evidence.''

The jurors were, we think, competent, and the court correctly so held.

It is insisted by defendant that it was improper to admit evidence of the alleged admissions of the defendant as against Byers, and then to show the independent acts of Byers as against the defendant, and upon this showing to assume a conspiracy and give instructions on the guilt of Byers as principal rapist, and this defendant as a principal before the fact.

It is not necessary that a conspiracy to commit crime should be proven by express agreement between the parties thereto, but it may be shown by facts and circumstances from which it may be inferred. That there was a conspiracy between Ben Byers and the defendant to commit an assault upon Alice J. Wood, for the purpose of having carnal connection with her, we think clear. The facts and circumstances heretofore set out justify the inference that there was such conspiracy. But it was not necessary that Ben Byers should be joined in the information in order to the introduction of evidence by the State to show that a conspiracy did in fact exist between them. Wharton on Criminal Evidence (9 Ed.), sec. 700, says: "It makes no difference as to the admissibility of the act or declaration of a conspirator against a defendant, whether the former be indicted or not, or tried or not, with the latter; for the making one a co-defendant does not make his acts or declarations any more evidence against another than they were before; the principle upon which they are

admissible at all being that the act or declaration of one is the act or declaration of all united in one common design, a principle which is wholly unaffected by the consideration of their being jointly indicted." [State v. Kennedy, 177 Mo. 98; State v. Boatright, 182 Mo. 33.] Nor was it necessary to charge defendant with being present, aiding, abetting and assisting Byers in the commission of the crime. "A party may be charged with doing the act himself and be held liable, under such charge, for being present, aiding and assisting another in doing it." [State v. Valle, 164 Mo. l. c. 551; State v. Orrick, 106 Mo. 119.]

It is said for defendant that error was committed in permitting the State to show, over the objection of defendant, the flight of Byers, as tending to show that he was the accomplice of defendant in the commission of the crime. We are not advised by whom this proof was made, unless it be T. H. Bradshaw, a witness for the State, the admission of whose testimony with reference to Byers is assigned as error, but an examination of his testimony fails to show anything with respect to the flight of Byers or his absence from the country. We are therefore expected, we presume, to look through this large record, containing over three hundred and seventy-five pages, to find, if we may, what witness it was that testified to this effect. Granting, however, that the evidence of T. H. Bradshaw was inadmissible, in no instance was objection made to any material question put to him until after it was answered, and it was then too late. A party cannot sit by during the examination of a witness by an adverse party, and before interposing an objection to a question wait until the witness answers, and, if the answer suits him, whether the question be proper or not, accept it, and if it does not suit him, object. If, however, the answer be not responsive to the question, and is objectionable upon that ground, the proper course to pursue, if it be desired to remove any prejudicial effect that the evidence might have on

the minds of the jurors, would be to move the court to exclude it at the time, or ask the court to instruct the jury to disregard it; but the defendant having failed to do either, he will not now be heard to complain. [1 Thompson on Trials, secs. 715-716; Hollenbeck v. Railroad, 141 Mo. 97.]

But pursuing the same line of inquiry as to the flight of Byers, his mother, a witness for the State, with whom he lived up to that time, was asked if she had ever heard of him, directly or indirectly, since the 13th day of July, 1903. The question was objected to as being incompetent, irrelevant and immaterial because no part of what happened at the time the alleged aider, abetter or conspirator was present, and because any act of Ben Byers, not done with the knowledge and consent of defendant, could not bind defendant. The objection was overruled and defendant excepted. The witness answered that she never had. While we think the objection should have been sustained upon the ground of irrelevancy or immateriality, as suggested by defendant in his bill of exceptions, we do not think the answer could in any way have prejudiced the rights of defendant, or that the judgment should be reversed upon that ground.

Defendant complains that he was tried, as shown by the evidence and instructions of the court, for two crimes: i. e., (1) aiding and abetting Byers in the commission of a rape upon the prosecutrix, and (2) the commission of the crime by defendant himself. The argument is that by proceeding this way the defendant was not informed of the nature and the cause of the accusation against him. Upon the other hand, the State contends that only one crime was committed, although there were two separate and distinct rapes upon the prosecutrix, one by Byers, aided by the defendant, and the other by defendant. Each of these acts constituted a part of this transaction and crime, and it was competent to prove both against defendant as parts of the

*res gestae.* This question was before this court in State v. Duffy, 124 Mo. 1, wherein Patrick Murphy and defendant Duffy were originally jointly indicted for rape upon Mrs. Rose, but subsequently the indictment as to Duffy was quashed, and he was thereafter separately indicted. The officer who arrested Duffy found Patrick Murphy on top of Mrs. Rose in the act of ravishing her, and Duffy sitting about five feet away on a board. Mrs. Rose testified that both Murphy and Duffy seized her and ravished her. The court permitted the State to show Murphy's connection with the offense for which Duffy was upon trial. Duffy claimed this was error. This court said: ''The third and sixth assignments are substantially the same, in which it is claimed the court committed error in allowing evidence to go to the jury in relation to Murphy's connection with the offense for which the defendant herein was upon trial. Murphy and Duffy were alike guilty, they acted together and in concert, and what one did in the presence of the other, in committing the offense, was the act of the other as much as if done by himself.''

Section 2364, Revised Statutes 1899, provides that, ''Every person who shall be a principal in the second degree in the commission of any felony, or who shall be an accessory to any murder or other felony before the fact, shall, upon conviction, be adjudged guilty of the offense in the same degree, and may be charged, tried, convicted and punished in the same manner, as a principal in the first degree.'' So that it is perfectly plain that the defendant was properly informed against, tried, and convicted as principal in the first degree.

The acts of Byers and defendant in assaulting and ravishing the girl constituted but one offense, the result of one common purpose, and the fact that Byers first assaulted her while Sykes looked on, and after he got through defendant did the like, did not make two separate and distinct offenses; so that the evidence with re-

spect to the transaction was properly admitted upon either theory of the case, and the court instructed the jury accordingly. Nor does it make any difference in this case whether defendant or the prosecutrix knew the man who first assaulted and ravished her; it is clear from the evidence that the defendant was an accessory before the fact to that part of the transaction. He stood by and witnessed the performance, and gave encouragement to the perpetrator of the crime by his presence and by refraining from raising his hands or voice in response to the appeals of the girl for assistance in the protection of her honor from the hands of the brute who was attempting to, and did, despoil her of that which is more sacred to a virtuous woman than life itself.

It is contended by defendant that the ninth instruction given on behalf of the State is erroneous. It reads as follows: "The court instructs the jury that Miss Alice J. Wood is the prosecuting witness, and is called the prosecutrix, that she has no interest in the case whatever other than that of a witness, and that her testimony is to be weighed exactly like that of any other witness in the case; and the jury are to believe or disbelieve her and allow such weight to her testimony as their judgment, under the evidence, shall dictate. And the jury are further instructed that they may convict the defendant on the uncorroborated evidence of the prosecutrix, Alice J. Wood, provided that they believe from the evidence, beyond a reasonable doubt, that the defendant is guilty of rape as charged. And the jury are instructed that the defendant is a competent witness in his own behalf, but the fact that he is a witness in his own behalf, and the interest he has at stake in this cause, may be considered by the jury in determining the weight and credibility of his testimony."

The argument is that if the prosecutrix had been wronged, she would naturally desire to see some one punished for it, and that, while she is not a real party to the suit, she is a nominal party and more likely to

color her testimony than other disinterested witnesses. The instruction, on first reading, and taken alone, would seem to be misleading, in that it tells the jury that the prosecuting witness has no interest in the case whatever other than that of a witness, and that her testimony is to be weighed exactly like that of any other witness in the case, when it must be conceded that she feels a greater interest in the prosecution and punishment of the person whom she believes has wronged her than could other witnesses who have no grievance against him. The prosecution, however, being by the State, she has no control whatever over it, and strictly and technically speaking, she has no greater interest therein than have others, whether witnesses in the case or not, for every good citizen has an interest in seeing the law enforced and crime punished.  Nevertheless, the instruction went too far, unless qualified and balanced by some other instruction given in the case.  This was done by the first instruction given on behalf of the defendant on the same feature of the evidence.  It tells the jury that "the prosecuting witness, Alice Wood, is a competent witness, but the fact that she was *implicated* in the alleged affair may be taken into consideration in determining the weight and credibility to be given to her testimony." So that, when the instructions are considered together and with reference to each other, as they should be, it seems clear that the jury could not have been misled, and there exist, therefore, no grounds for complaint, on that score.  In this connection, it is proper to remark that the word "implicated," used in the said first instruction for defendant, was improper and misleading, and casts a reflection upon the prosecutrix, in that it implies a connection in a bad sense with a discreditable transaction; but it was doubtless used by mistake and not by design.

As we have said, the two different acts of rape constituted but one offense. If two different persons should in rapid succession, one after the other, shoot, kill and

murder another, in pursuance of a preconcerted plan, or, should one of them stand by and see or encourage the other to do so, they might, in either event, be indicted and prosecuted separately or jointly, and evidence as to conspiracy to commit the crime, up to and until after its completion, would be admissible against both upon the trial of the cause. Defendant, however, contends with much earnestness that there was no legal evidence on which a conviction of Ben Byers could be sustained, and hence the defendant could not be held guilty as an accessory-principal for aiding Byers. We are utterly unable to give assent to this position. The evidence, though circumstantial, and without the admissions of the defendant, shows Byers' guilt beyond any and all question.

As to the defendant himself, does the evidence tend to show a conspiracy between him and Byers to assault and ravish the prosecuting witness, and the ravishing of her by defendant in pursuance thereof, regardless of any thing that Byers may have said or done after the crime was completed? We attach no importance whatever to the fact that she may have, two weeks after the alleged rape, made a complaint against defendant for an attempt to rape. It is at least charitable to say that she did not, in all probability, know the difference between rape and an assault to commit rape, and it is not to her discredit that she then made the lighter charge; besides, she may, in the first instance have entertained some doubt as to defendant's guilt of the graver offense, for she states in her testimony that she became unconscious just after defendant got on her person and felt his private touch hers, and as she could not swear to the fact of penetration, so far as defendant was concerned, she therefore, doubtless, supposed at that time that a charge of assault to commit rape was the proper one. But that defendant raped her is shown by the circumstances leading up to and connected with the crime. Indeed, he admitted to witness Rizor

that he had had connection with her after Byers got through, but with her consent, but this statement as to her consent is not borne out by the evidence. Byers and Sykes, as shown by the evidence, lived in the same neighborhood and were friends. They both attended a social gathering at a schoolhouse in the neighborhood on the night of June 28, 1903. Miss Alice Wood was there also, having gone there with her cousin, John Browning. Defendant was quite anxious to take her home, and with her consent, got permission from Browning to take her. Byers had taken a young lady, there that night, but got her to excuse him from taking her home. Defendant then arranged with Byers for the exchange of buggies. Byers and Sykes traveled the same road in going to their respective homes, as also to the home of the prosecutrix. Sykes and the girl started first. While traveling along the road defendant looked around and back of the buggy several times, as if he was expecting some one. He attempted to take improper liberties with the prosecutrix, although he had only met her once before, and he did not testify that he had any reason to think she was not a virtuous girl. She repulsed his advances, was indignant, and jumped out of the buggy, saying she would rather walk than ride with him. Just at that time the other party to the crime appeared and grabbed hold of the prosecutrix, threw her down in defendant's presence, and then and there had sexual intercourse with her against her will. In the struggle of her life whom should she appeal to but the man who was her escort? But he turned a deaf ear to her heart-rending appeals and, according to his own testimony, did not raise his hand to protect her or give her the least assistance in her struggle to preserve her honor. On the contrary, according to the testimony of the prosecutrix, he assisted in holding her until the other man, whosoever he may be, had accomplished his purpose. Although people in the neighborhood heard the screams of the prosecutrix, defend-

ant stood by, and says himself that he made no effort to defend her because he was afraid the mysterious man, who was no other than Byers, would shoot him. The description of Byers as given by the prosecutrix was almost in exact accord with that given by witness Albert Allen, who knew him well. After the outrage had been perpetrated, and the mysterious rapist had departed, the defendant, who must then assuredly have gotten over his fears, gave no alarm; nor did he assist the prosecutrix to the McGovern home, but instead he goes to Byers' home, saying nothing about the crime that had been committed, quietly goes to bed with Byers and remains with him in his room until late in the afternoon the next day. The next heard of defendant he was leaving home, driving to another town in an adjoining county, whence he took the midnight train for South Dakota. Once there, he assumed the name of Jack Wilson, and was known by that name in his new abode until arrested and started back to this State. The man by whom defendant was arrested, a deputy sheriff by the name of Rizor, stated in his testimony that defendant denied knowing Byers, but admitted having sexual intercourse with the young woman.

When all the facts detailed by the various witnesses are considered together, there is no escaping the conclusion that Byers and defendant were acting in concert from the time they exchanged buggies at the schoolhouse until this horrible crime was perpetrated, and that defendant was not only present, aiding and assisting Byers in the commission of this rape, but that he also took advantage of the helpless and distressed condition of the girl, and ravished her himself. Sykes, however, denies this, and testifies that he started to the girl's assistance, but that the man who was in the act of ravishing her told him that if he came any closer he would shoot him, and he got scared and retired until the man left her, when he then went to the girl, picked her up and carried her to his buggy. But his story

is flatly contradicted by the girl herself and by the evidence of Rizor. The girl testified that he did assault her, against her will, and witness Rizor testified that defendant stated to him that he did have connection with her. To say the least, were defendant's story true, his ardor must have cooled very rapidly from the time he took unseemly liberties with the girl in his buggy and by his treatment forced her to jump therefrom, to permit another to take her away from him and ravish her in his immediate presence.

In conclusion, we will say that this is, perhaps, the most outrageous case of its character, and the most brutal and revolting in all of its details, of any which has been before this court. The evidence, to our minds, shows defendant's guilt beyond any reasonable doubt. He has had a fair trial, and the judgment should be affirmed. It is so ordered.

All concur.