STATE of Missouri, Respondent.

v.

Elvin Wayne ADAMS, Appellant.

No. 50379.

Supreme Court of Missouri,

Division No. 2.

June 8, 1964.

Rehearing Denied July 13, 1964.

Thomas F. Eagleton, Atty. Gen., Jefferson City, and James P. Jouras, Sp. Asst. Atty. Gen., Kansas City, for respondent.

L. L. Bornschein and Charles M. Shaw, Clayton, for appellant.

EAGER, Judge.

■ Defendant was convicted of rape and, after a finding by the Court of prior felony convictions, he was sentenced to life imprisonment. His motion for a new trial had previously been overruled. Defendant was represented at the trial by able appointed counsel; no brief has been filed here, so we examine the merits of all sufficient assignments of error contained in his motion for a new trial, and also those parts of the record required by Rule 28.02, V.A.M.R. Such has long been our universal practice.

The record is lengthy, but we shall need to recite such facts as are necessary for a determination of the sufficiency of the evidence, since that point is made. Shirley Hartupee, her husband Tom, and their three-year-old daughter had been living for about a month in Unit No. 7 of the Twin Oaks Tourist Court, at 1226 South Kirkwood Road, in the City of Kirkwood. Shirley worked at the Katz store in Kirkwood but had not been working on the day involved here, February 22, 1963. The husband worked at a service station from midnight to 8:00 a. m. Each of them was 20 years old; at the time involved here their child was at her grandmother's. On that day Shirley (whom, for convenience, we designate as such) engaged in more or less ordinary activities during the day and early evening and at approximately 11:00 p. m. she was at home ironing her husband's uniform. He, the husband, had been sleeping since some time in the afternoon; Shirley awakened him so that he could get ready to go to work, but he had not yet gotten up. At about 11:15 a friend of Shirley's, Greta Jean Buchanan, who, with her husband, also lived at the Twin Oaks, came in; she was employed at Katz and had just left work at 11:00 o'clock. Apparently neither the inner door nor the glass storm door was locked. When Greta entered, she apparently closed the storm door but left the inner door open or partially so.

The unit consisted of one medium sized room, a kitchen or kitchenette adjoining it with merely an opening between, and a bathroom separated by a door. In the main room there was a double bed, a dresser or chest of drawers, one or more chairs, a bench, and perhaps other furniture. There was a built-in wash basin in this room with a light bulb over it; there was another light in the bathroom. Both were apparently turned on and off by means of short chains. There was only one outer door to the unit; the motel or tourist court consisted of several separate buildings and there was only one other unit in this particular building.

Greta testified: that she had just come in and talked a few minutes (with Mr. Hartupee still in bed) when "a colored man came in the door. And he had a gun in his hand and he said, 'Don't move, turn around, or I'll kill you.'" What we now relate is a composite digest of the testimony of the three persons, Shirley, her husband and Greta. The man pushed Shirley over by the dresser, Tom raised up, and the man told him to "lay down and cover up his head"; the man then turned off the bedroom light, pointing the gun at Shirley, holding it at one time so that it touched her ear. At that point a second man, also a negro, came in the door. We interject here to say that this second man was positively identified as the defendant Adams. The first man to enter was later identified as one Frank Spears. Adams told the first man to hold the gun on the man in the bed, which he did; Adams then pushed the two girls into the kitchen, holding them by their necks, and demanded their jewelry and money; they gave him two rings, one a wedding ring and one a class ring; Shirley told him there was money in a billfold on the chest of drawers. This man then took the two girls back into the bedroom, and pushed them down so that their knees were on the floor and their heads were in the seat of a chair, while he looked for the money; in this process things were thrown around and generally disarranged; after a short time this man (Adams) "jerked" Shirley up off the floor and had her look for the

billfold, keeping his hand on the back of her neck. During much of this time she had been telling the man to take the money and get out. When she did not find the billfold, he, Adams, pushed her "back down on the chair." Soon thereafter Adams began taking liberties with Shirley, feeling under her sweater while holding one hand on her neck, and telling her to take her clothes off. This she refused, crying and pushing at him and telling him to leave her alone; he succeeded in pulling all her clothes down from the waist ("slim jims," a pantie girdle and a sanitary belt), pushed her across the bed, jerked her up, and then pushed her down on the floor on her back, telling her repeatedly that "they would kill us if I didn't be quiet." In this situation he proceeded to have sexual intercourse with her, as definitely established by her testimony. During this time she, in her own words, "kept pushing at him and turning and trying to get up from under him, and crying and telling him to leave me alone"; she further testified that while on the floor she tried to push defendant off of her with her hand and with her leg. She was permitted to testify, on being recalled, that she "was scared to death." We have omitted some of the sordid details of the evidence, as unnecessary to the proof of rape. In the meantime, the other man Spears, had taken Greta into the kitchen where she was kept for substantially the same length of time as was consumed by the foregoing acts. The evidence, of course, did not detail what occurred there except that Greta was permitted to testify, without any objection, that Spears hit her on the head three or four times with the gun which he still had, and that he tried to take her clothes off; she also testified that she heard Shirley crying and begging Adams to stop, take the money and leave.

After these acts the men came back together, pushed the women into the bathroom and locked the door, after telling them that if they called the police or tried to follow, they would come back and kill them. During all of this time the bathroom light was burning. The police were called promptly and both girls were taken to the St. Louis County Hospital.

We add here certain parts of the evidence concerning Tom Hartupee, the husband. For a time he was guarded by Spears with the gun, after the latter had fully or partly covered up his head. Tom testified that Spears said if he moved he would "blow my head off," and that he was hit on the head several times with a hard object when he tried to get up. Shirley testified that Tom kept trying to get up, that they kept hitting him and that even from the floor the defendant Adams "kept reaching up and hitting him." At any rate, Tom never succeeded in getting out of bed.

Shirley and her husband, with Greta and certain relatives, were taken to a "line-up" at the Sheriff's Office on the evening of February 23, 1963. There they viewed six negro men and heard all of them speak. Adams was identified by Shirley, both by appearance and voice, and by her husband from his voice. Actually, the matter of identification has become a minor consideration in view of the defendant's own testimony. Spears was also identified there. All persons concerned were then taken to the County Police Headquarters where, according to the State's evidence, Adams admitted in the presence of these various people that he had raped Shirley. Following that, he was questioned at some length by two detectives of the County Police force; according to these witnesses, he gave a full oral statement which was related in detail in the evidence. For our purposes, it is sufficient to state that it corroborated generally the essential testimony of Shirley and Greta, so far as the present charge is concerned. In this statement defendant stated: that Spears took a clock radio when he left, and also had the girls' rings; that they drove away (as they came) in Adams' car, and when Spears got out to get some sandwiches he left the gun, radio and rings in the car; that Adams then drove away and took them to the home of a cousin of his on New York Street in Kirkwood. After

taking the oral statement and on the same evening, the police recovered the gun and radio from that address, taking Adams with them. The people there denied getting the rings. The defendant was then taken to the unit in question of the Twin Oaks Motel where he was instructed to point out the different locations and objects involved, inside and outside the cabin, and photographs were taken; these were later used as exhibits at the trial.

Shortly after midnight, which would be on the very early morning of February 24, 1963, a written confession was taken. This was later introduced in evidence. It followed generally the oral statements and it also recited that defendant understood that he did not have to make a statement. It was signed by defendant, and the corrections of all typographical errors were initialled by him. In this confession defendant confirmed the material elements of the charge of rape in considerable detail; he denied that he and Spears took any money. The confession recited that no threats or promises had been made to defendant to induce the making of the statement.

The State showed by evidence from hospital employees the presence of male sperm in smears taken from the vagina of the victim when she was examined almost immediately after the occurrences. She testified that, since she was in her menstruation period, she had not had intercourse with her husband for five or six days prior to the date here in question. The gun, a "break-open" type .38 caliber revolver, was identified by the witnesses at the trial as one which looked like the one carried and used by Spears. In view of the manner of its recovery and the testimony of defendant, no question as to its identity really remained. The radio was definitely identified. A wallet was produced and identified as the one which had been lying on the dresser and which contained $230–$240. The evidence as to that item is somewhat incomplete, but that is immaterial since the charge here is not robbery or stealing. One officer testified that he found the wallet un-

der the bed in the cabin when pictures were being taken the next night, but it is not shown whether it then contained the money or not.

The defendant testified in considerable detail. His defenses were a denial of the rape, and a contention that he had been beaten and threatened into making both the written confession and the oral admissions. He testified that Officer Patty, alone, took him into a room in handcuffs on two different occasions on the day of his arrest, knocked him down, "kneed" him, and beat on him, telling him he would kill him if he didn't say that "he did it"; also, that he was threatened again on the way from the "line-up" to police headquarters and told that if he did not "admit it to those people," they would kill him. Substantially all of this alleged abuse was charged by defendant to Officer Jack Patty, a county detective. This officer specifically denied that he beat, struck or threatened the defendant; Officer Herren, who was assigned to *duty* with Patty, and who was with him during the period in question, denied that he had struck or threatened defendant and testified that he *knew* that no one else did because he was with the others at the times involved, and specifically that he was with Patty "at all times." The Court first heard evidence very fully outside the presence of the jury and determined that the confessions and oral statements were admissible.

The substance of the rest of defendant's testimony was: that he had known Spears for about six years and had taken the gun in question from Spears as a "pawn" for a loan; that he gave the gun back to Spears on the evening in question, February 22, 1963; that Spears thereafter asked Adams to drive him to *this particular motel,* saying that the people there owed him some money; that he drove to this particular cabin (Hartupee's), supposedly at Spears' direction, and waited in the car for 5–7 minutes after Spears went in; that he then got out and knocked on the door, someone said "come in" and he entered; that Spears had the gun in his hand and had the two girls

(Shirley and Greta) over by the kitchen; that Shirley ran over and grabbed him, saying that she would do anything for him if he would make the other man get out and let Greta alone; that he pushed her away and said that "there was nothing that I wanted from her"; that he asked Spears what he was doing and he "said he was trying to make her tell where the money was"; that he saw someone lying in the bed, covered up; that he told Spears to get out, that he (Adams) left, and that Spears came out to the car a few minutes later; that he did not threaten anyone, did not remove any of Shirley's clothing, and did not have intercourse with her or perform the other acts related in the testimony; that when Spears came out he brought the radio, saying that it was his; that when Spears got out to get some sandwiches later, he drove away and took the radio and the gun to the home of his (Adams') cousin on New York Street, telling her that they belonged to Spears.

It is thus seen that defendant admitted in Court being in the home of the Hartupees on the evening in question, with Spears, at a time when both Shirley and her friend Greta were there. His rather weird story as to what happened was for the jury. The State put on evidence, outside the presence of the jury, of four prior burglary convictions of the defendant from March 2, 1954, to March 28, 1958; from the first conviction he was on parole until the time of the second conviction, after which he served in the penitentiary until discharged on January 7, 1956; on the last two convictions he received concurrent three-year sentences, being discharged on October 14, 1959. All four judgments of conviction were entered upon pleas of guilty.

■■ Defendant attacks the sufficiency of the evidence first, in that the evidence "failed to establish that the prosecutrix offered resistance to her utmost," and secondly, by a general assignment of error addressed to the overruling of his motions for acquittal. It is entirely obvious that, so far as the general assignment is concerned, the evidence of the State was sufficient to show the essentials of the crime of rape, i. e., carnal knowledge of the victim by force, and against her will. State v. Terry, Mo., 325 S.W.2d 1; § 559.260, RSMo 1959, V.A.M.S.; State v. Egner, 317 Mo. 457, 296 S.W. 145; State v. Moore, Mo., 353 S.W.2d 712. There are cases which indicate that the victim should offer the utmost resistance available to her under the circumstances. Where there is substantial evidence of resistance that question is for the jury under proper instructions. State v. Bird, 358 Mo. 284, 214 S.W.2d 38, 39, and cases cited. There was resistance here, and very substantial resistance. And it has frequently been held that violence and threats of violence may supply or serve in lieu of the requirement of resistance. State v. Wynn, Mo., 357 S.W.2d 936, 939; State v. Beck, Mo., 368 S.W.2d 490; State v. Schuster, Mo., 282 S.W.2d 553, 556; State v. Catron, 317 Mo. 894, 296 S.W. 141, 143. Here, not only did the defendant offer personal violence and threats to his victim, but his associate Spears had threatened all concerned with his gun and had emphasized his threats by beating Greta on the head with it. On the State's evidence, this was all one associated chain of events, from which defendant may not separate himself. There was abundant evidence for the submission.

■ It is claimed that the Court erred in permitting Shirley Hartupee to be recalled after she had left the stand, to testify that she was "scared to death." The Court certainly had the right in its discretion to permit the recall, and no reason is stated in the assignment why the admission of the testimony was erroneous, except for the bare statement that in permitting the testimony the Court reversed a prior ruling. Not only is that statement insufficient, but the state of mind of the victim was a relevant matter. At the trial the question was objected to as calling for a conclusion. This was properly overruled.

■ Error has been assigned to the admission of the written confession, the oral statements and admissions, and the photographs taken of defendant at the scene; this, on the ground that they were all obtained by threats and physical violence. The evidence for and against this contention was heard very fully, outside the presence of the jury, and in its presence. The Court ruled, as it had the right to do, that there was substantial evidence to sustain the State's burden to show that the confessions and admissions were voluntary and that they were admissible in evidence. On this controverted evidence, we agree. See: State v. Lee, 361 Mo. 163, 233 S.W.2d 666; State v. Weidlich, Mo., 269 S.W.2d 69, and cases cited; State v. McBrayer, Mo., 269 S.W.2d 756. On a question of fact such as this, the defendant may not insist that his testimony be accepted and the State's evidence rejected. The assignment is denied.

■ Defendant also assigns as error the fact that the written confession "contained evidence of other offenses." Upon the admission of the confession, the Court excluded a preliminary paragraph in which it was stated that the statement was taken "in connection with the Rape, Robbery and Assault that was committed at * * *." Counsel also objected because the body of the statement contained similar references. We find four places near the beginning of the rather lengthy confession in which reference is made to "rape, robbery and assault" at the time and place here in question, as for instance, "Do you have any knowledge of this crime of rape, robbery and assault * * *"? Presumably, the officers questioning defendant were merely attempting to cover the various possible angles of the situation. We feel that it might have been preferable to have eliminated those references, but where defendant was charged with, and the State's evidence clearly showed, an aggravated crime of rape, there could have been no substantial prejudice from the mere mention of possible charges of robbery and assault

against someone. The remainder of defendant's own written statement convicted him of assault. All the circumstances concerning any possible stealing or robbery were already before the jury from the oral testimony, and certainly the form of this confession added little or nothing in that respect. Furthermore, evidence of or references to interrelated crimes committed as part of one continuous transaction and pursuant to a common design, are admissible. See the cases cited in the next paragraph of this opinion.

■ Assignment of error is made on the admission in evidence of the pistol, the radio and the wallet, on the ground that defendant was not shown to have had any sufficient connection with them or any of them. First, as to the gun: If the defendant elects to travel with a person who threatens and beats people with a gun (as here shown by the State's evidence) while the defendant himself commits an atrocious crime, at least partially under the protection and threat of the gun, then, of course, the gun becomes admissible against him as a part of the total chain of events. There can be no possible question here of the identity of the gun, for defendant himself took the officers to it. Where two or more persons engage in a common crime or crimes, proof of all relevant facts is generally proper. In State v. Parr, 296 Mo. 406, 246 S.W. 903, at loc. cit. 905, where two different persons had been charged, the Court said: "Where, as here, two crimes are committed under such circumstances as to constitute one continuous transaction in the accomplishment of a common design, and the facts are so interrelated that the crimes are concurrent, proof of one cannot be made without a showing of the facts tending to establish the other. In short, the entire otherwise relevant facts may be regarded as part of the res gestae. State v. Sykes, 191 Mo. 62, 89 S.W. 851; State v. Katz, 266 Mo. loc. cit. 503, 181 S.W. 425. Without their admission, a connected and intelligible statement of the transaction could not well be made nor a clear under-

standing had of the same." And see: State v. Mangercino, 325 Mo. 794, 30 S.W.2d 763, 765; State v. Lewkowitz, 265 Mo. 613, 178 S.W. 58, 64; State v. Allen, Mo., 246 S.W. 946, 947; State v. Bell, 359 Mo. 785, 223 S.W.2d 469, 471; State v. Johnson, Mo., 347 S.W.2d 220, 222. All of the substantially simultaneous acts become part of the res gestae. The gun was properly admissible in evidence here. On the same principle, the clock radio was admissible. It was stolen at the time of the other occurrences and defendant admitted taking it to his cousin's house, from whence it was recovered. As to the wallet, the State's evidence showed that it was found by an officer on the next night, under the bed, where it had obviously been thrown by someone. The State's case was replete with evidence that defendant himself spent considerable time in searching for the wallet and for money; the women had been robbed of their rings. Under these circumstances, the wallet was admissible as a part of the chain of circumstances, even though the evidence as to the status of its contents, when found, was incomplete.

It is claimed that the information was defective in that it did not allege that the prior convictions were "final judgments," and that therefore evidence of prior convictions was improperly admitted. Our statute, § 556.280, Laws 1959, does not require any such allegation. By its last subsection it is provided that if a prior conviction has been appealed the section shall not apply until the appeal has been disposed of. While the State should not, of course, allege or show any prior conviction or convictions from which it knows an appeal or appeals are pending, we hold that this statute does not put an initial burden upon the State to allege and prove that there has been no appeal. If such a situation exists, the defendant will know that fact and may raise the question affirmatively. The evidence of prior convictions is now taken outside the presence of the jury, and defendant is always represented by counsel. Moreover, in this case the question is *moot*,

because all of the prior judgments of conviction were entered upon pleas of guilty, which would certainly preclude any appeal in the ordinary sense.

The State called a newspaper reporter, Jacob Wolf, in rebuttal; he testified that about noon on February 23, 1963, he saw defendant in his cell beating his head against the steel wall and beating his mouth against the bars of his cell door. It is claimed that this was improper rebuttal. In view of defendant's testimony as to the beatings which he had supposedly received from Officer Patty, this evidence was clearly admissible in rebuttal, even though defendant had himself testified that he was "hysterical" and hit his head against the wall 2, 3 or 4 times. The testimony of the reporter differed from that evidence and was, to that extent, contradictory.

Defendant's assignment that Instructions 1, 2, 3, 4 and 5 were not "proper declarations of the law" is wholly insufficient, since it gives no reasons whatever. State v. Brewer, Mo., 325 S.W.2d 16. A separate assignment to Instruction 5 states that it tells the jury in effect that if the confession was found to be voluntary "it must be accepted as true, even though at the trial defendant denied it * * *." That instruction was as follows:

"The Court instructs the Jury that any oral or written statement made by any defendant, even though it should contain matters that tend to prove his guilt, is admissible in evidence against the defendant and is to be given such probative value as evidence as you believe it deserves, if you find it was voluntarily given.

"And in this regard, the Court instructs you that by the term 'voluntarily' the Court means not secured by duress, that is, by striking or beating the defendant or by threats of physical harm to him, or by promise of immunity to him by anyone competent to grant such immunity.

"However, the Court instructs you that to make a statement or confession voluntary

in nature, it is not necessary to show that such statement or confession was spontaneous, that is, made without either persuasion or questioning."

 The first paragraph of the instruction very plainly tells the jury that *if* the confession was found to be voluntary, it should be given "such probative value as evidence as you believe it deserves." The instruction is not subject to any such construction as is now sought, and the contention is wholly without merit. A substantially identical instruction was given in State v. McCloud, Mo., 328 S.W.2d 586, and sustained against other objections.

Complaint is also made of the failure of the Court to instruct the jury "on the lesser offenses of Assault with Intent to Ravish, and, Common Assault." Here a consummated, forcible rape was abundantly proved, and any instruction on a lesser crime was not only unnecessary but would have been improper. State v. Chandler, Mo., 314 S.W.2d 897; State v. Bird, 358 Mo. 284, 214 S.W.2d 38; State v. King, 342 Mo. 975, 119 S.W.2d 277; State v. Ball, Mo., 133 S.W.2d 414.

The assignment that the verdict is against the evidence and the weight thereof is insufficient for any purpose. State v. Terry, Mo., 325 S.W.2d 1; State v. Daegele, Mo., 302 S.W.2d 20. The remaining assignment is that the Court erred in overruling a request for a mistrial when Officer Patty testified "that upon his arrest of the defendant, he denied the charge and refused to make any further statement, but some time later admitted the charge and gave the officer both an oral and signed written confession." When Patty testified that Adams, upon his arrest, denied that he was involved, no objection whatever was made. When he testified that after the "lineup" Adams stated that he "did participate," counsel asked for a mistrial because defendant had first "denied it" and "now the officer says" he made a statement admitting it. So far as we can see, neither the motion at the trial nor the present assignment advances any *reason* for a mistrial or for convicting the Court of error. From the colloquy we gather that counsel was relying upon a supposed "silence" and refusal to make a statement when arrested, which he thought should not be "admissible evidence," plus the fact that he was "later subjected to make a statement." In these proceedings there was no comment upon a *refusal* to make a statement, for there was no refusal, nor was there "silence"; the defendant simply denied that he was involved. Later he made statements, oral and written, under controverted circumstances. This sequence of events furnished no ground for a mistrial nor is any reason therefor stated.

Nothing appears in the record to indicate that defendant did not have a fair trial; he was ably represented by counsel; the jury was fully instructed and found him guilty. The penalty assessed by the Court was within the limits permitted by statute.

We find no error in those parts of the record which we examine under Rule 28.02. The judgment is affirmed.

All of the Judges concur.