## THE STATE v. MAURICE LEWKOWITZ, Appellant.

### Division Two, July 6, 1915.

1. **RAPE: Sufficient Evidence: Conspiracy.** The evidence is set
   forth at length in the statement and is *held* sufficient to support
   the verdict, finding defendant guilty of rape and fixing the pun-
   ishment at imprisonment in the penitentiary for ninety-nine
   years, and also to establish a conspiracy between defendant and
   three others to commit the crime.

2. **CONTINUANCE: Chance for Consultation With Counsel.**
   Where the alleged rape, in which four men took part, was com-
   mitted on March 9th, the defendant fled to another State and
   was arrested on March 19th and brought back and kept in jail
   until the time of his trial, and his case, at the request of his
   attorney who had been his counsel from the time of his arrest,
   and who without assistance had tried two of the companion
   cases, was set for trial on April 27th, with the understanding it
   would then be tried, and just a few days before the trial began
   defendant employed another attorney, the court did not abuse
   its discretion in denying defendant's application for a continu-
   ance, filed when the case was called for trial on April 27th, on
   the ground that he was poor and unable to employ counsel; that
   he had been unable to consult his attorney first employed except
   when he came to the jail to consult other prisoners, that said
   attorney had been so busy trying other cases that he had no
   opportunity to consult with him or his other attorney about the
   case and that the services of said attorney were not guaranteed
   until April 25th.

3. **JUROR: Asking Questions: Bias.** If the defendant made no
   such objection to the juror's conduct in asking questions of
   witnesses as entitles him on appeal as a matter of right to ask
   for a reversal on the ground of the juror's misconduct in per-
   sistently injecting himself into the trial, and the questions asked
   do not of themselves show bias on his part, but point rather in
   the opposite direction and indicate he was prompted solely by a

desire to understand the facts, the judgment of conviction will not be reversed on the theory that the trial court erred in permitting the juror to act as assistant prosecuting attorney in the examination of witnesses, although affidavits were filed charging that the juror after the trial had made statements indicating his bias and determination to convict before he qualified.

4. ————: Impeachment. Statements made by a juror after the trial are not competent to impeach his verdict.

5. FLIGHT: Instruction: Sufficient Evidence. Testimony by the defendant that, upon discovering prosecutrix's dirty clothing, he immediately left the building into which she had been invited by him, and where the State alleges he and three others forcibly ravished her, and testimony by others that the police began search for him the next day and he was arrested ten days later in another State, is sufficient to justify an instruction on flight.

6. ————: ————: Explanation: Return Without Requisition. Where there was no evidence on the part of the defendant explaining why he left the State immediately after the alleged offense and remained away until arrested ten days later, the fact that he returned to the State under arrest without requisition did not require the instruction on flight to embody that fact as an explanation of his absence.

7. RAPE: Instruction: Evidence of Sodomy: Not to Be Considered. Where there is evidence that another of the four conspirators charged with rape had "intercourse" with prosecutrix in her rectum and mouth, an instruction telling the jury that said acts do not constitute rape should be given; but if it goes further and tells the jury that these acts are not to be considered by them in arriving at their verdict, it should be refused, or these words omitted, for the reason the jury has the right to consider everything that was done at the time of the ravishment, as part of the *res gestae*, in determining whether defendant was guilty of rape.

8. ————: ————: ————: ————: Failure to Strike Out Improper Clause: Not Saved in Motion for New Trial. Failure of the trial court to strike out words which render improper an otherwise proper instruction asked by defendant, and to give it as thereby modified, is not preserved for review on appeal unless such failure is set forth in the motion for a new trial as a ground therefor. [Refusing to follow State v. Conway, 241 Mo. l. c. 292, announcing that, notwithstanding the motion for a new trial does not assign such failure, a new trial will be granted if the record satisfies the court that a failure to instruct the jury upon a question of fundamental right may have worked an injustice to defendant.]

9. **REMARKS OF PROSECUTING ATTORNEY.** An attempt by the prosecuting attorney in his opening statement to apologize to the jury for reciting some of the indecent facts connected with the offense, accompanied by a direction by the court, upon defendant's objection, that he keep to the facts and do not argue the case, does not constitute reversible error.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw,* Judge.

AFFIRMED.

*Ben E. Todd* for appellant.

(1) The court erred in overruling defendant's application for a continuance. State v.. Lewis, 74 Mo. 222. (2) The court erred in permitting the prosecuting attorney in his opening statement to make remarks which were prejudicial to the accused, not founded upon any admissible evidence, and in permitting the prosecuting attorney to make a statement which was argumentative in its nature. State v. Jackson, 95 Mo. 653; State v. Stubblefield, 157 Mo. 365; Glover v. Railroad, 129 Mo. App. 575. (3) The appellate court will carefully examine and scrutinze the record and refuse to permit a conviction to stand when it depends solely upon the testimony of the prosecutrix without very strong corroboration, and in such case the character of the prosecutrix and her antecedent history should be prime consideration. State v. Brown, 209 Mo. 413; State v. Goodale, 210 Mo. 290; State v. Tevis, 234 Mo. 284; State v. Donnington, 246 Mo. 355. (4) The court erred in admitting evidence during the trial which was prejudicial to the defendant, upon the promise of the State to connect it up, which was not in fact connected up, nor withdrawn from the jury by instruction. State v. Thomas, 99 Mo. 257; State v. Bateman, 198 Mo. 222. (5) The court erred in permitting juror Walton to act as an assistant prosecuting attorney in persistently interfering with and cross examining wit-

nesses, after the examination direct, re-direct, cross and re-cross had been completed both by the State and the defense, which occurred ten times during the trial. A juror is not an advocate and has no right to usurp the functions of a prosecuting attorney. State v. Crawford, 96 Minn. 95. (6) The verdict was against the evidence and the weight thereof and a new trial should be granted for that reason. (7) The court erred in giving instruction number five for the State, there being no evidence on which to base an instruction on flight. State v. Evans, 138 Mo. 116. (8) The court erred in instruction five in that it did not require the jury to take into consideration "the other facts and circumstances in evidence in connection with the evidence of the alleged flight." The instruction was misleading and prejudicial in the form in which it was given, even if there had been evidence in the record upon which to base an instruction on flight. State v. Fairlamb, 121 Mo. 147; State v. Knowles, 185 Mo. 160; State v. Harris, 232 Mo. 319; State v. Kyles, 247 Mo. 650; State v. King, 78 Mo. 555. (9) The court erred in refusing instruction number six asked by the defendant. If it did not correctly declare the law, it was sufficient to call the attention of the court to the subject-matter. It was the duty of the court to modify the offered instruction and give a correct instruction as modified. This point does not have to be saved during the trial or mentioned in a motion for a new trial, although proper exception was saved in this case. This has always been the law of this State. State v. Matthews, 20 Mo. 55; State v. Jones, 61 Mo. 232; State v. Stonus, 62 Mo. 596; State v. Lowe, 93 Mo. 547; State v. Davis, 141 Mo. 522; State v. Adler, 146 Mo. 18; State v. Brinkley, 146 Mo. 37; State v. Clark, 147 Mo. 20; State v. Reed, 154 Mo. 122; State v. Fennon, 158 Mo. 149; State v. Moore, 160 Mo. 443; State v. Barton, 214 Mo. 316. All of which citations are found and followed in State v. Conway, 241 Mo.

286. And for the same reasons the court erred in refusing instruction seven asked by defendant. (10) The court erred in not instructing the jury on the whole case. The evidence as to the acts of Guerringer, Harrison and others in the absence of the defendant, may have been admissible under the *res gestae* rule, but should have been limited in an instruction such as was correctly given in State v. Anderson, 252 Mo. 88. Sec. 5231, R. S. 1909; State v. Nicholas, 222 Mo. 434; State v. Lackey, 230 Mo. 707; State v. Hoag, 232 Mo. 317; State v. Harris, 232 Mo. 323; State v. Fairlamb, 121 Mo. 147; State v. Conway, 241 Mo. 271. (11) The court should have defined and instructed on corroboration, and this is especially true in a rape case, where the conviction and sentence depend upon the evident of the prosecutrix, solely and alone, and the failure to so instruct was prejudicial error, for which a new trial should be granted. Sec. 5231, R. S. 1909; State v. Reeves, 97 Mo. 668; State v. McCaskey, 104 Mo. 644; State v. Brown, 209 Mo. 413; State v. Goodale, 210 Mo. 290; State v. Tevis, 230 Mo. 284; State v. Donnington, 246 Mo. 355; State v. Nicholas, 222 Mo. 434; State v. Lackey, 230 Mo. 707; State v. Hoag, 232 Mo. 308; State v. Harris, 232 Mo. 323; State v. Conway, 241 Mo. 271. (12) Where the record shows that there has been a failure to instruct upon a question which goes to the fundamental rights of the defendant and by such failure injustice may have been done, the question of non-direction may be raised for the first time in the Supreme Court. The jury should not be left to grope in the dark. Sec. 5231, R. S. 1909; State v. Conway, 241 Mo. 271; State v. Banks, 73 Mo. 592; State v. Palmer, 88 Mo. 568; State v. Henson, 106 Mo. 66; State v. Hutchinson, 111 Mo. 257; State v. Maguire, 113 Mo. 670; State v. Nelson, 118 Mo. 124; State v. Taylor, 118 Mo. 153; State v. Rufus, 149 Mo. 406.

*John T. Barker,* Attorney-General, and *W. T.* *Rutherford,* Assistant Attorney-General, for the State.

(1) Everything done or said by the parties to a conspiracy relating to its purposes during its existence is admissible in evidence against all or either of the conspirators, whether said or done in the presence of each or not. State v. Bobbitt, 228 Mo. 265; State v. Darling, 199 Mo. 201; State v. Copeman, 186 Mo. 120; State v. Pratt, 121 Mo. 572; State v. Walker, 98 Mo. 103. (2) Where the prosecuting attorney indulges in improper argument and on objection of defendant the court requests the jury to disregard the remarks and withdraws such remarks from the consideration of the jury and admonishes the prosecuting attorney to keep within the record, the defendant if not satisfied with the court's action, should ask the court to take further action and failing so to do acquiesces in the action of the court. State v. Wanna, 245 Mo. 563; State v. Raftery, 252 Mo. 83. (3) When the prosecuting attorney is rebuked by the court for improper remarks that will ordinarily be sufficient. State v. Dudley, 245 Mo. 188; State v. Terrell, 246 Mo. 333; State v. Kullman, 225 Mo. 632; State v. Barrington, 198 Mo. 91. (4) The motion for a new trial failing to specify any question of law upon which the court failed to instruct, the error, if any, on account thereof is not reviewable on appeal. State v. Conway, 241 Mo. 291; State v. Chissell, 245 Mo. 291; State v. Dockery, 243 Mo. 599. (5) A conspiracy may be shown by either direct and positive evidence or by circumstances from which it may be inferred. State v. Walker, 98 Mo. 95; State v. Sykes, 191 Mo. 78. (6) Declarations and conduct of prosecutrix in a prosecution for rape made or done a few moments after the commission of the offense and while she was still under the influence of the excitement produced by it are admissible as a part of the *res gestae.* McMurrin v.

Rigby, 80 Iowa, 322; Hoist v. State, 23 Tex. App. 1; Parker v. State, 67 Mo. 329; McMarth v. State, 55 Ga. 303; People v. Gage, 62 Mich. 271; Lambert v. People, 29 Mich. 71; People v. Brown, 53 Mich. 533; State v. Sykes, 191 Mo. 62. (7) Unless the motion for new trial or appellant's brief points out the particular testimony complained of the court will not go through the record and take upon itself the burden of discovering the illegal or incompetent testimony. State v. Holden, 202 Mo. 584; State v. Brown, 168 Mo. 449; State v. Whitsett, 232 Mo. 529. (8) If a defendant desires to have a matter of exception reviewed in the appellate court he must assign it as a ground in his motion for a new trial. State v. Dilts, 191 Mo. 672; State v. Scott, 214 Mo. 257. (9) The court will not go outside of the assignments of error as contained in the motion for a new trial, so far as matters of pure exception, not contained in the record proper, are concerned. State v. Foley, 247 Mo. 627; State v. Gilmore, 110 Mo. 1; State v. Headrick, 149 Mo. 404; State v. Harlan, 130 Mo. 394; State v. Alred, 115 Mo. 471; State v. Mieukin, 24 Mo. App. 462. (10) Where the verdict is manifestly for the right party, errors in the giving or refusing of instructions will not work a reversal. State v. Vickers, 209 Mo. 33; State v. McClure, 25 Mo. 338; State v. More, 61 Mo. 276; State v. Miller, 111 Mo. 542; State v. Privitt, 175 Mo. 230; State v. Taylor, 134 Mo. 152. (11) Corroboration of prosecutrix in a trial for rape is not essential to sustain a conviction. State v. Stackhouse, 242 Mo. 449; State v. Tevis, 234 Mo. 179; State v. Welch, 191 Mo. 179; State v. Dilts, 191 Mo. 665; State v. Day, 188 Mo. 359; State v. Marks, 140 Mo. 656; State v. Lovitt, 243 Mo. 510; State v. Pierce, 243 Mo. 524. (12) When appellant has failed to call the attention of the court to its failure to instruct on any phase of the case, the appellate court will not review the alleged error. State v. Horton, 247 Mo. 663; State v. Con-

nors, 245 Mo. 482; State v. Chissell, 245 Mo. 555; State v. Greaves, 243 Mo. 551; State v. Dockery, 243 Mo. 599; State v. Gaultney, 242 Mo. 391.

ROY, C.—Defendant, having been sentenced to ninety-nine years in the penitentiary on a conviction of rape, has appealed.

The offense was committed (if at all) on March 9, 1914, between five-fifteen and six o'clock p. m. at 1224 Grand Avenue, Kansas City. The evidence tends to inculpate at least five men.

The information in the case was filed on March 24, 1914, and the trial was begun on April 27, 1914. Another information was filed against Vic Gueringer, Thomas Kinevan, Leo Brennan and Oscar Harrison. From a conviction under that information Harrison appealed to this court. The opinion affirming that conviction is reported in 263 Mo. 642.

The prosecutrix, Gertrude Shidler, was born and reared in the country near Terre Haute, Indiana, spending nearly all her life on the farm. She married Clyde Shidler in 1903, and became the mother of three children. She was divorced in 1910, remarried to her former husband in 1911, and again divorced. She charged her father-in-law with raping her, and received from him five or six hundred dollars in settlement of that trouble. In a deposition he denied the charge, but admitted that he paid the money. There were witnesses from Indiana on both sides of the question as to his reputation and as to the reputation of the prosecutrix. Mrs. Shidler admitted on the stand that while living in Indiana she charged another man with an attempt to rape her. He was sentenced to jail. She admitted that she came to Kansas City about two years before the trial and there lived with Ray Ausherman. She said it was under a promise of marriage. Ausherman testified that on several occasions he had sexual intercourse with her in Indiana. The

evidence tended strongly to show that she lived for a while with one Farina as his wife in Kansas City. While in Terre Haute she sometimes served as a practical, but untrained, nurse. She followed the same vocation after coming to Kansas City. For several months prior to the alleged offense she lived in the home of a lawyer, Mr. Wimmer, and nursed patients of Dr. Tucker, and perhaps of other physicians. She testified that she had met Dr. Schwartz who was an osteopath. During the previous summer of 1913, in her nurse's garb, she often attended the picture show conducted by Vic Gueringer, and on one occasion she was carried from that show in a faint. There was testimony that she suffered from "heart leakage."

The house in which it is claimed the offense occurred in an old two-story building fronting east. A plain, uncarpeted wooden stairway leads from the sidewalk to a landing which extends five or six feet west to a door, which opens into a hall which runs west, without any openings on the south, to a window in the west end. That window opens on the low roof of the first story which extends sixteen feet further west to an alley. The front room of the second story is entered from the landing and has no door opening directly into the hall. That room was occupied by the sign painter Forrest, who was therein at the time of the occurrence in controversy, which took place in the "big room" next west. Between those two rooms were double doors, which were kept closed except that there was a crack between them probably an inch wide at the top, vanishing as it neared the floor. Against these doors on the east side was a board rack used in sign painting. Its height was four or five feet. There is a door opening directly from the hall into the big room. The next door west opens from the hall into a small, uncarpeted and almost unfurnished "entry" room from which a door opens east into the big room. The space north of this small room is not separated from the big

room and may be called an alcove. There is come confusion in the evidence by reason of the fact that it is sometimes spoken of as a part of the big room, and sometimes as a separate room. At the southwest corner of the alcove is a door into a bed-room on the west. There were no signs or other peculiar indicia of a doctor's office on the premises. The extreme west room is the kitchen, opening by doors and windows on the low roof. It was furnished with a gas range, an ice box, bottles of beer, a telephone, chairs and a table. Opening into the kitchen and on the east thereof is the dining room reasonably well furnished. Under the rug in that room was a hole seven by sixteen inches in the floor and fitted with a loose board. Between the dining room and the big room were bedrooms and a bathroom. A ladder in the bathroom led to the roof through a skylight. There was a skylight over the big room and some of the other rooms. The doors between the hall and the rooms had Yale locks, and some of them had mortised locks, how many is not shown.

About five o'clock Mrs. Shidler, dressed not as a nurse but in an ordinary street costume, went to the office of Dr. Tucker in the Missouri building, to be treated for a severe cold bordering on pneumonia. She left that building about fifteen minutes later, and in front of it met the defendant. Their accounts of what followed are contradictory of each other. The substance of his evidence is that they agreed to have sexual intercourse, and that they went together to 1224 Grand Avenue, he borrowing four dollars from a friend on the way; that they went upstairs, through the little room into the big room; that he laid down two dollars and that she took off her hat and coat and lay down on the davenport; that he started to have intercourse with her, but found her clothes so dirty that he was so disgusted he left the building at once; that there was no one else present at the time. She testified that when they met he tipped his hat and said,

"Good evening.   Are you a nurse?"   That she answered, "Yes," whereupon he said, "Dr. Schwartz wants you on a case right away."   That she said, "Dr. Schwartz, where?" that he said, "Right down here. Come and I will walk with you;" that they went to 1224 Grand Avenue, up the steps, into the hall and into the little room; that thereupon she said, "This room doesn't look like a doctor's office to me;" that he said, "On into the next room," into which she could see and which looked like it might be a doctor's office; that they entered the big room and that Lewkowitz locked the door and made a lewd proposal to her, at the same time taking hold of her; that she pulled loose and ran to the door, which she found locked; that he went into the room on the west and came back with three or four other men, among whom were Gueringer and Harrison; that while she was crying, screaming and trying to get free, they pulled her onto the table and held her, while Lewkowitz, Harrison and Gueringer had intercourse with her in the usual way; and that Gueringer tried to have intercourse with her in the rectum, and then stuck a pistol to her mouth, compelling her to open it, and inserted his sexual organ therein, threatening to kill her if she bit him. She testified thats she then lost consciousness.  As to what occurred when she became conscious she said: "Some one had thrown water on me and they were cursing about it. I hardly know what was said, only something about the water; then there was—I don't know whether the one that had thrown the water went out into the hall.  Gueringer and some one went out into the hall, and went down the hall, and after I got up I seen that the door was open; then I ran out of the door and looked down the hall east to the entrance and there was two or three men down there.  I could see through the glass door there was a man or some object on the other side.  It was either some one trying to get in or they were trying to get out.  So, I looked down the

hall west and there was a window raised and I thought my chance to get away, so I ran down the hall."

She stated that during all that time she had her hat, coat and gloves on, and that her pocketbook was fastened to her wrist by a chain; that she then ran and jumped out of the window at the west end of the hall onto the roof, screaming for help, thinking to jump off, but that the telephone wires brought her to her senses. She stated that people gathered in the alley below; that Harrison came out on the roof, called her a vile name, tried to get her back in the house; that he then went back in, and another man came and went back; that the officer then came out to her on the roof and she went with him into the building, making complaint to him of what had been done to her.

Several witnesses testified that she appeared on the roof screaming, saying that they were trying to murder her; that she took off her hat, gloves and coat and threw them and her purse into the alley. They were picked up and restored to her. There was only sixty-five cents in the purse.

Officers McCombs and Bauswell got there about six-ten or six-thirty. They found the front hall door upstairs locked. They went down and through to the alley. They found her on the roof screaming for help, her hair partly down, the sleeve of her waist torn and her waist wet. The officers then went back to the front hall door. Forrest, the sign painter, come out of his room and with a key unlocked the hall door. They testified that Mrs. Shidler's face, neck and wrists were red, and one of her sleeves was torn, and that she then made a complaint as to what had been done to her. Those officers went through the rooms. In the big room they found the table and cover wet, the latter more or less wadded up, the gas stove and one or more chairs overturned. The davenport was not wet. A deck of cards and poker chips were on the table in the alcove. A spread on one of the beds was wet and

"mussed up." All the rooms were a condition of confusion. Mrs. Shidler's coat and skirt were wet. She was taken by the officers to the police station and thence to the general hospital. There she was examined by Drs. Allen and Owen, who found two fresh bleeding lacerations about an inch long extending from the opening of the rectum. One of the doctors testified that they were superficial like a briar scratch.

At one time as Mrs. Shidler was leaving the witness stand the record shows the following: "Witness rises, falls from witness stand, carried from the court room by Mr. McCord, Deputy Marshal, Mr. Curtin, Assistant Prosecuting Attorney, and Mrs. Simmons, Jail Matron."

Two witnesses, McNulty and Kearns, testified that Oscar Harrison came out on the roof and tried to get Mrs. Shidler to come in off the roof. Mr. McNulty testified that Harrison said to her, "Come in, you silly s—of a b—, what is the matter with you?"

Forrest, the sign painter, testified that he was in his shop at the time, and that he heard no screaming or unusual noises in the adjoining room. He denied on the stand that he said to the officer the next morning that he heard screams back there. He admitted saying to the officer that it looked as if the place were going from bad to worse.

Officer Barrett testified that on the morning after the alleged assault he had a conversation with Forrest in which the latter said that he heard screams, and, on being asked by witness why he didn't go back and help her, said, "The place is going from bad to worse. Would you go back there with that bunch of fellows back there?" A proper foundation was laid for that evidence.

Mrs. Chessie Williams, employed at the clothing store on the ground floor at 1224 Grand Avenue, testified that the first screams she heard were within a few

265Mo.40

minutes of six o'clock and came from the roof, that the man who came out on the roof did not curse Mrs. Shidler and that Mrs. Shidler's hair was not down.

Defendant was twenty-six years old and had lived in Kansas City since 1904. The police began a search for him the next day after the alleged offense, but failed to locate him until the 19th of March, when he was arrested while playing a game of cards in a hotel in Omaha. There was no evidence on the part of defendant tending to explain why he left Kansas City. He returned without a requisition, and one of the officers testified that he said, "I guess I am wanted for that Kansas City Grand Avenue job." A police officer testified that he saw the defendant at 1224 Grand Avenue on the Saturday night before the alleged offense.

There was no direct evidence in the case as to who occupied and controlled the rooms where the incident occurred.

Defendant was in jail from the time of his return to Kansas City with the officers. Mr. Martz was his attorney all that time, and had tried two of the cases prior to the trial in this case. Just a few days before the trial of this defendant began, he employed Mr. Martin as additional counsel. This case had previously been set for trial on April 27th, at the request of Mr. Martz, with the understanding that it would be tried. When the case was called for trial, defendant applied for a continuance on the ground that he was poor and unable to employ counsel, that he had been unable to consult his lawyer except when he came to the jail to consult other prisoners; that Mr. Martz had been so busy trying other cases that they could not consult about this case; that his attorneys Martz and Martin had had no opportunity to consult with each other about the defense, and that the services of Mr. Martz were not guaranteed until after April 25th. The application did not specify any absent witness or missing

testimony of any kind. Mr. Martz stated at the time of the application that he had been alone in the previous trials of these cases. The application was refused.

On eleven different occasions during the trial juror Walton asked more or less questions of the different witnesses. The first incident of the kind was as follows:

"Mr. E. M. Walton (juror):  You spoke about finding a woman's shirt on the bed. I didn't understand whether it was a woman's shirt or a man's shirt?

"The Court:  That has no connection with this case. That is all."

Fred McNulty testified that he was present when they were taking Mrs. Shidler from the roof and that he did not see Lewkowitz about the place. The juror said:  "The defendant could have been in the room and you wouldn't have known it?" and the witness answered, "Yes, sir, he could have been."

While Mrs. Shidler was being cross-examined as to her charge against her father-in-law, the following occurred:

"Mr. E. M. Walton (juror):  I would like to ask if this Indiana proposition has anything to do with this 1224 Grand Avenue?

"The Court:  Yes sir, it has.

"Mr. Martz (Out of hearing of jury):  We except to the question asked by the juror."

Finally the following occurred:

"Mr. E. M. Walton (juror): May I ask a question?

"The Court:  The practice of asking questions is not to be encouraged on the part of the jury. The attorneys will elicit all of the information that is necessary.

"Mr. Martz  (Out of hearing of jury):  We object to the juryman interfering with the witness.

"The Court:  Proceed.

"Mr. Martz:  That is all."

None of the other questions asked by the juror betrayed any bias of his mind.

No objection, exception or suggestion as to such conduct on the part of the juror was made by counsel for defendant except as above shown.

The fifth instruction given was as follows:

"5.   Flight raises the presumption of guilt, and, if the jury believe and find, from the evidence, that after the commission of the offense alleged in this information, the defendant fled from the State, and tried to avoid arrest and trial for said offense, then the jury may take this fact into consideration in determining his guilt or innocence.

"The court instructs the jury that although they may believe and find from the evidence that the defendant fled from the State of Missouri, after the commission of the alleged offense (if any), yet if they believe and find from the evidence that he did not flee from a motive to avoid arrest and trial on this charge, they should not consider it as an element in arriving at their verdict as to the defendant's guilt or innocence of this charge."

The defendant's refused instruction 6 is as follows:

"6.   You are further instructed that although you may find and believe from the evidence, beyond a reasonable doubt, that some person or persons, other than the defendant, may have committed the detestable and abominable crime against nature, upon the said Gertrude Shidler, a female human being, by then and there inserting his sexual organs into the rectum of her, the said Gertrude Shidler, such action does not constitute rape, and cannot be considered by you in arriving at a verdict in this case."

His seventh refused instruction was the same as the sixth except that the word "mouth" was used in place of the word "rectum."

During the statement of the case to the jury by counsel for the State the following occurred:

"I say to you gentlemen in describing the rest of what transpired at 1224 Grand Avenue, I say to you with an apology to your sense of decency, I say to you that it is with hesitation and embarrassment that I describe to you what transpired following the entrance of these men into that room.

"Mr. Martz: We object to that.

"The Court: Avoid arguing the case at this time.

"Mr. Jacobs (Continuing): I only say this to you gentlemen in passing to the statement of what transpired in that room if I offend your sense of propriety and your sense of decency—

"Mr. Martz: We object to that.

"The Court: Avoid argument. State what the evidence will show as to the facts."

Many objections were made to language used in such opening statement and in the argument of State's counsel to the jury and to the introduction of evidence based on the theory that no conspiracy was shown in the case.

The motion for a new trial called attention to the fact of the court's refusal of instructions asked by the defendant, but did not mention the failure to instruct in any other respect. Along with the motion for a new trial there was filed the affidavit of Mr. Martin, who was of counsel for defendant, alleging that on May 4th, which was three days after the verdict, affiant in the presence of William E. Crawford had a conversation with Mr. Walton, who had been of the jury, in which Walton said that he had told his wife that he would, if chosen on the jury, "hang the jury until hell froze over before he would vote to acquit the son of a bitch," and that Walton in that conversation said, "All the rest of the gang should be hung to teach all the rest of the sons of bitches around 1224 Grand Avenue a lesson." And that on May 5th Walton

said to affiant that Martz lied when he said that Gertrude Shidler did not faint; that he, Walton, knew absolutely that she did faint; that he could and would not go home and face his family and neighbors if he voted for less punishment; that Martz was no better than Lewkowitz when he sought to discredit Gertrude Shidler by showing that she was not a virtuous woman; and that he (Walton) had made up his mind that defendant was guilty when he heard of his arrest. The affidavit of William E. Crawford supports that of Mr. Martin as to the alleged conversation on May 4th. Those affidavits were made the foundation for the point in the motion for a new trial that the verdict should be set aside on account of the bias and prejudice of juror Walton. Mr. Walton's affidavit was filed in which he admitted that he said to Martin that Mrs. Shidler did faint during the trial and that anybody who said that she did not faint was a liar. He denied categorically the other charges made against him in the affidavits.

I. Appellant contends that there is not sufficient evidence to support the conviction. It was held otherwise in the Harrison case, and the evidence here is even stronger than in that case. For instance, it is conceded by this defendant that he was the person who accompanied Mrs. Shidler to the room where the offense is alleged to have occurred, and the evidence tends to prove that he fled to avoid arrest.

**Sufficiency of Evidence.**

II. The claim that there is no evidence of a conspiracy is also settled by the Harrison case.

III. There is no reason why we should interfere with the trial court's discretion in refusing the continuance. Mr. Martz had, without any assistance,

represented other defendants in two previous trials for the same offense. The fact that he may not have had time to consult Mr. Martin about the case is no ground for a continuance under the circumstances of this case. We are cited to State v. Lewis, 74 Mo. 222, where the defendant's counsel deserted him and he was dependent upon counsel who only four days previously had been appointed by the court and who had no previous knowledge of the case, and did not know of their appointment until the next day after the appointment. In that case the application showed the absence of an important witness.

**Continuance.**

We have had no suggestion as to any particular in which defendant has been prejudiced by the refusal of his application.

IV. Appellant complains that the trial court permitted juror Walton to act as an assistant prosecuting attorney in the examination of witnesses. It must be conceded that the juror in this case injected himself into the proceeding much more actively than has been done in any other reported case. The question asked by the juror as to whether Mrs. Shidler' charge against her father-in-law in Indiana had anything to do with the charge against the defendant does not necessarily show bias on his part. He had heard objections made by defendant's counsel to many questions during the trial on the ground that the facts called for were remote as to time, distance or otherwise from the issue on trial, and he had heard the court sustain many of those objections. For instance, while Mrs. Shidler was on the stand, the following occurred:

**Questions by Juror.**

"Q. You fainted in that picture show one night?

"Mr. Martz: We object to whether she fainted. Where she fainted has nothing to do with this case. This happened a year before this alleged transaction.

"The Court: Objection sustained."

It is possible and even probable that the juror's mind was free and unbiased and he was prompted solely by a desire to understand the situation. We call attention to the result of that inquiry by the juror. The court promptly answered: "Yes, sir, it has." If it be conceded that the juror's mind was unbiased the incident was favorable to the defendant, because of the answer made by the court. That answer was heard by the other jurors as well as by Walton. It will be noticed that defendant's counsel at no time requested the court to silence the juror or to limit his interference. That request could have been made out of the hearing of the jury. In the one instance there was an exception to the question asked by the juror. That seemed to be aimed at the nature of the question and not at the fact that it was asked by the juror.

Plaintiff's counsel cite State v. Crawford, 96 Minn. 95. In that case the point made by the appellant was, not that the juror was allowed to ask the questions, but that the questions were improper. No objection was made and no exception taken. It was held that the point was not subject to review as a matter of right, and that the failure of the court to interfere was not necessarily reversible error.

In this case the appellant made no such objection to the juror's conduct as entitles him as a matter of right to ask that the case be reversed for error of the trial court. We are, in this connection, confronted with the affidavits as to statements made after the trial by the juror. Neither the affidavit of a juror nor the affidavit of another as to statements made by a juror after the trial is competent to impeach the verdict. [Easley v. Railroad, 113 Mo. 236; State v. Rush, 95 Mo. 199; State v. Cooper, 85 Mo. 256; State v. Dunn, 80 Mo. 681.]

In State v. Palmer, 161 Mo. l. c. 175, this court said, "Every lawyer is supposed to know, that for about three-quarters of a century in this State the

inflexible rule has been that a juror neither by his statement nor by his affidavit is allowed to impeach his verdict.'' Sometimes, in discussing this question, the courts have said that the juror cannot be permitted to reveal ''the secrets of the jury room.'' It might be implied from the language that a juror is competent to impeach his verdict by showing matters which did not occur during the period of the jury's existence as such.

Here the fact complained of is that the juror had prejudged the case and had expressed such opinion before he was chosen as a juror. We are of the opinion that such fact is within the rule which provides that the juror cannot impeach the verdict. It is clearly within the rule as stated in the Palmer case supra. We find no authority to the contrary.

In Thompson v. State, 4 Ga. App. 649, it was held that the relationship of the juror to parties interested in the prosecution could not be shown by the affidavit of the juror made after the verdict was rendered, for the purposes of impeaching that verdict.

In State v. Labry, 124 La. 748, it was held that the non-residence of the juror could not be shown in that way; and in State v. Smith, 103 Miss. 356, it was held that the forming of an opinion by the juror prior to the trial could not be so shown.

V. The fifth instruction on the question of flight to avoid arrest was free from error. It is substantially in the same form as the instruction in State v. Brooks, 92 Mo. 1. c. 585. In State v. Evans, 138 Mo. 1. c. 127, it was held that the mere fact that the

**Flight.**

defendant was arrested in Arizona was not sufficient evidence to justify an instruction on flight. But in this case the defendant himself testified that he left the building at once while prosecutrix was in the building. The police began the search for him the next day, and he was arrested ten days afterward in

Omaha. The evidence was sufficient to justify the instruction.

It was held in State v. Harris, 232 Mo. 317, that when the defendant introduced evidence to explain his flight the instruction should call the attention of the jury to such explanatory evidence.

In State v. Fairlamb, 121 Mo. 137, the defendant sent for the officer to come and arrest him. It was held that the instruction should have embodied that fact.

The fact that the defendant in this case returned to Missouri under arrest without requisition does not call for such a modification of the instruction.

The point is made that the instruction does not require that the evidence as to flight should be considered in connection with the other facts and circumstances in evidence. In State v. Knowles, 185 Mo. 1. c. 176, it was held that an instruction without those words had that obvious meaning when read with the other instructions.

VI. Instructions six and seven asked by the defendant on the subject of sodomy were properly refused. The words "and cannot be considered by you in arriving at a verdict in this case" should have been omitted, for the reason that the jury had the right to consider the evidence as to all that was done there at the time as part of the *res gestae* in determining whether the defendant was guilty of rape. Without those words the instructions would have been proper and should have been given. But the failure of the court to strike out those words and to give the instructions as thus modified is not before us for review because such failure was not set out in the motion for a new trial. That motion did state that the court had given improper instructions for the State and had refused proper instructions asked by defendant, but did

Instruction:
Rape:
Evidence
of Sodomy.

not say anything on the subject of the failure to so modify and give said instructions asked by defendant.

Appellant's counsel in his brief, speaking of such failure to modify and give the instructions asked by defendant, says: "This point does not have to be saved during the trial, nor mentioned in a motion for a new trial." Whether it is necessary to save the point during the trial by objection or exception we will not here decide, because such decision is not necessary to a determination of the case. The fact that the point was not raised in the motion for a new trial leaves it outside the power of this court to review it, even though it may have been saved during the trial. In what follows we shall discuss some of the cases on the necessity of saving the point during the trial, but shall do so only as collateral to the question as to the necessity of mentioning it in the motion for a new trial.

Instruction: Failure to Modify: Motion for New Trial.

Appellant, in support of the contention that the point saves itself without being mentioned in the trial proceedings or in the motion for a new trial, cites the following cases: State v. Matthews, 20 Mo. 55; State v. Jones, 61 Mo. 232; State v. Stonum, 62 Mo. 596; State v. Lowe, 93 Mo. 547; State v. Davis, 141 Mo. 522; State v. Brinkley, 146 Mo. 37; State v. Clark, 147 Mo. 20; State v. Reed, 154 Mo. 122; State v. Fannon, 158 Mo. 149; State v. Moore, 160 Mo. 443; State v. Barton, 214 Mo. 316.

The Conway case, 241 Mo. l. c. 286, says: "But this court has always held, even while following the doctrine of the Bond case, that if an erroneous instruction was requested by a defendant, then it became the duty of the court to give a correct instruction upon that question, and no exception for failure to do so was necessary in order to preserve the court's action as a ground for new trial and for review on appeal."

We have examined those cases. Not one of them justifies the assertion that an exception at the trial

is not necessary. The doctrine of those cases is fully set out in the Adler case, 146 Mo. l. c. 25, as follows: "Defendant's first refused instruction seems to have been intended to present this theory of the case, and while it does not do so very clearly and was properly refused for that reason, it was sufficient to call the court's attention thereto, indeed equivalent to a request to instruct thereon; and in having failed to so do it committed error."

That case simply holds that the failure of the trial court to modify and give the instruction is error, but says not a word as to whether it is necessary to save the point at the trial or in the motion for a new trial. Neither do any of the other cases above mentioned except the Conway case. So much is said only because appellant insists that those cases are authority for the assertion that it is not necessary to mention such failure in the motion for a new trial.

The general doctrine is that a failure to instruct must be specifically assigned at least in the motion for a new trial in order to be available on appeal. [State v. Wellman, 253 Mo. l. c. 316; State v. Douglas, 258 Mo. l. c. 293.] There is no authority anywhere except in the dictum in the Conway case for the assertion that a failure to modify a requested instruction and to give it as modified can be raised in this court without having been assigned in the motion for a new trial.

VII. Appellant cites the following paragraph from the Conway case, l. c. 292: "Notwithstanding the foregoing rule, if satisfied from the record that there has been a failure to instruct the jury upon a question which goes to the fundamental rights of the defendant, and that by such failure injustice may have been done or a verdict returned different than if such failure had not occurred, this court, in the interest of justice, will not hesitate to grant a new trial,

Instruction: Fundamental Right: No Assignment in Motion.

though the question should be presented here for the first time.''

That paragraph was expressly doubted and in effect overruled in State v. Douglas, 258 Mo. l. c. 293, and should be no longer followed.

VIII.  State's counsel in his opening statement to the jury attempted to apologize to the jury for the character of the facts he was about to state.  On ob-**Remarks of** jection of defendant the court promptly **Prosecutor.** ordered him to keep to the facts.  We have no hesitation in saying that no reversible error was committed in that respect.

Many other points are raised in brief of counsel for defendant, but, after a careful examination of them, we find no reversible error, and it would serve no good purpose to prolong the discussion.

The judgment is affirmed.  *Williams, C.,* concurs.

PER CURIAM:  The foregoing opinion of Roy, C., is adopted as the opinion of the court.  All the judges concur; *Faris, P. J.,* in result.