**STATE of Missouri, Respondent,**

v.

**Benjamin Henry WARD, Appellant.**

No. 54480.

Supreme Court of Missouri,
Division No. 1.

Sept. 14, 1970.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

Jerry S. Estes, Scott City, for appellant.

THOMAS F. McGUIRE, Special Judge.

Defendant was charged and convicted by a jury of first degree robbery by means of a dangerous and deadly weapon and having also been tried under Sec. 556.280, RSMo 1969, V.A.M.S., the second offender act, was sentenced to 25 years' imprisonment. He appeals.

From the evidence presented at the trial the jury could have found the occurrence of the following events:

About 9:30 a. m. on April 23, 1968, the appellant and his accomplice entered the store (with living quarters in the rear), owned and operated by V. S. Stephens, located a few miles from Sikeston, Missouri, pulling stockings or masks over their faces as they entered. Defendant carried a sawed-off shotgun and his accomplice carried a large wrench. Defendant demanded money of Stephens, knocked Mr. Stephens down and dragged him behind the grocery counter and held the shotgun on him. The accomplice seized Mrs. Stephens and forced her to the door of the Stephens' store to wave away a customer. Thereafter the accomplice brought her to the cash register, made Mrs. Stephens open the register, and took the money therefrom. The defendant's accomplice demanded keys to Mr. Stephens' car and proceeded to the living quarters behind the store portion of the building, where the accomplice seized a wallet from Mrs. Stephens' pocketbook, the keys to the Stephens' white Chevrolet, and two pistols, one German automatic pistol and a .22 caliber pistol. The defendant and his accomplice drove away in the Stephens' 1963 white Chevrolet and headed east on Highway 61. That morning Isaac Tate saw Ward, whom he knew previously, driving a 1965 reddish Plymouth on Highway 61, followed by a 1963 white Chevrolet, subsequently identified as the Stephens' automobile, driven by a colored person, but Mr. Tate did not recognize the driver. After the Chevrolet passed, Mr. Tate saw it turn over into a ditch on a curve and the driver ran to the Plymouth, driven by defendant, got in, and the Plymouth drove away.

Pursuant to a radio message, trooper Robert G. Mouser stopped a 1965 Plymouth, maroon color, near Perryville, Missouri, being driven by the defendant, with a negro passenger. Both defendant and his passenger were placed under arrest. The automobile was searched and found therein was a double-barreled, sawed-off shotgun, a .22 caliber pistol, a German automatic pistol, $165.95 in cash, four brown jersey gloves, four shotgun shells, a hand satchel, grease paint, some long strands of hair and some paint remover. The guns and the money were in the "console" in the front seat. The two pistols were identified by Mr. Stephens as the pistols taken from him in the robbery. He also identified the shotgun as being the weapon used by the defendant in the robbery.

Defendant testified in his own defense and denied any involvement in the robbery. He was on parole from the Missouri penitentiary at the time he was arrested. He testified that the Plymouth car belonged to him and that he and his companion left St. Louis early in the morning of April 23, 1968, and drove to Cape Girardeau. They had approximately $160.00 between them which they placed in the console of the car for safe keeping. Along the way they picked up two soldiers and took them to Sikeston to catch a bus and were paid $10.00. Then they drove to an overpass near Benton, Missouri, where they experienced car trouble. While they were working on their automobile two colored persons approached in a 1963 red Dodge and for $25.00 sold defendant the weapons seized by trooper Mouser. He testified he decided to return to St. Louis from Cape Girardeau, as he did not have the necessary travel permit required by his

parole. Further, that the army cap was left in his car by the two soldiers.

The defendant does not contest that the sufficiency of the evidence at the trial would sustain the conviction, but it raises four points of error. We shall consider the points in order raised.

The defendant contends that the trial court erred in admitting into evidence, over defendant's motion to suppress, a sawed-off shotgun, two pistols, gloves and $165.-95 in currency, and other items seized in defendant's car, on the grounds that the arrest and the ensuing search were unlawful, in violation of his constitutional rights, alleging violation of the Fourth and Fourteenth Amendments of the U.S. Constitution and Sec. 14, Art. I, Missouri Constitution of 1945, V.A.M.S. We will detail the testimony presented on the motion to suppress.

Trooper Mouser of the Missouri Highway Patrol was on duty in Perry County, Missouri, on April 23, 1968, when he received a radio dispatch from headquarters at Poplar Bluff, to stop a 1963, or later, model Plymouth, maroon colored, sedan, operated by two colored subjects, for something that had happened at Sikeston. Other than information received in radio transmission, hereinafter referred to as the first transmission, the trooper had no personal knowledge of what had occurred in Sikeston. Thereafter, the trooper observed, intercepted and stopped a 1965 maroon Plymouth, two-door sedan, occupied by two negro subjects, driven by the defendant, near or at Route E and 61. After stopping the car, the trooper had defendant produce his driver's license and then called troop headquarters by radio (the second transmission) and found there had been an armed robbery committed at Sikeston by two colored subjects. This part of the information was lost in the first transmission.

As the trooper was having difficulty with radio reception at the Route E location, he requested the defendant to fol-low him back to a place, 3 miles south of Perryville, known as Twilight Inn, which was a higher area where better radio reception could be obtained. After arriving at Twilight Inn the trooper received a third radio transmission from his headquarters, which gave him additional information regarding the armed robbery that had taken place in Sikeston, and more detailed information relating to the suspect maroon Plymouth vehicle, namely, that the vehicle had dual exhaust, magnesium wheels and stripes down the doors, which description matched defendant's vehicle, and that guns and currency had been taken in the robbery. Upon reception of this information from the third transmission, the defendant and his companion were placed under arrest and handcuffed by trooper Berger, who accompanied trooper Mouser. The troopers seized the keys from the vehicle, opened and searched the trunk, and then the whole motor vehicle.

Upon dismantling the console in the front seat, the troopers discovered a sawed-off shotgun, and one .22 caliber H & R pistol, a 7.65 automatic pistol, four brown jersey gloves, $165.95 in change, a satchel, four shotgun shells, grease paint, long strands of hair and paint remover. These items were seized and confiscated as evidence. Trooper Mouser knew at the time of the arrest that coins and guns were taken in the robbery but had no knowledge that the particular items seized had been used or taken in the robbery until after the search had been completed. The trooper did not have any description of the dress of the occupants of the suspect motor vehicle prior to the arrest. The third radio transmission informed the trooper that guns and change (money) were taken in the armed robbery, and there were some army clothes in the car. In his search, the trooper discovered an army hat on a shelf above the back seat.

The radio operator at patrol headquarters in Poplar Bluff was on duty at approximately 9:30 a. m. on April 23, 1968,

and transmitted by radio to trooper Mouser the information relating to the armed robbery at Sikeston, which the radio operator had received by radio, from the Sikeston police.

Deputy sheriff Ed Michael went to the scene of an armed robbery at Stephens' liquor store at Kluge's Hill, outside Sikeston, Missouri, in response to a phone call from Mrs. Stephens, at approximately 9:30 a. m. on April 23, 1968. Upon arriving at the scene, Mr. and Mrs. Stephens, the victims, gave him a description of the "getaway car", a 1963 Chevrolet, four-door sedan. He followed the two tracks of the getaway car across the highway east on a ground road for about a quarter of a mile, where he found an overturned white Chevrolet, 1963 four-door sedan. At the scene of the overturned car was the aforementioned Isaac Tate, and several other persons.

Trooper Darnell of the highway patrol testified that he received a radio dispatch from troop headquarters that an armed robbery had occurred at Kluge's Hill and that the two colored subjects fled in Mr. Stephens' 1963 white Chevrolet from the robbery scene. Trooper Darnell stated that at no time did he see any automobile fitting the description of the defendant's at or near the scene of the robbery and did not receive any radio transmission of the same. As a result of his investigation he ascertained that a 1963 or later, maroon, Plymouth automobile with magnesium wheels and dual exhaust was involved in the incident and he relayed the information to headquarters.

Trooper Larry Strayhorn observed the appellant driving his maroon 1965 Plymouth on Highway I–55 at its intersection near Benton, Missouri, and turned his patrol vehicle and pursued the defendant's car in a northerly direction on Highway I–55. The trooper stated he had received a radio dispatch advising of an armed robbery at Kluge's Hill and that a "red Plymouth had been involved and possibly two colored subjects involved". The defendant was stopped at Cape Girardeau and searched, trooper advising defendant that he was looking for a shotgun. None being found the defendant was permitted to continue on his way.

V. S. "Jack" Stephens, one of the victims, gave the police a description of his 1963 white Chevrolet which was used as the "getaway car". He described the two pistols and the money taken in the robbery. He informed the police that the robbers were colored men with socks over their faces and carrying a shotgun.

Mrs. Stephens gave police officers a general description of the two pistols and the money taken in the robbery.

When one has been lawfully arrested a police officer may take from him articles of evidentiary value without violating his constitutional guarantees against unreasonable searches and seizures, State v. Johnson (Mo.Sup.) 420 S.W.2d 305.

The admissibility of the items seized in the search hinge upon the validity of the defendant's arrest. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. This, in turn, depends upon the existence of probable cause for the arrest. Probable cause for a warrantless arrest is a constitutional criterion by which its legality is measured, Henry v. United States, 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134. The substance of all definitions of probable cause is a reasonable ground for belief of guilt, Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879. It is well settled that, " * * * Police officers may arrest without a warrant if they have reasonable cause to believe that the person arrested is guilty of a recent felony. * * *" State v. Craig (Mo.Sup.) 406 S.W.2d 618, 622; State v. Johnson (Mo. Sup.) 420 S.W.2d 305, 308. Thus, when the constitutionality of an arrest is challenged it is the function of the court to

determine whether the facts available to the officers at the moment of the arrest would warrant a man of reasonable caution in the belief that an offense has been committed by the arrested, Pendergrast v. United States (D.C. Cir.) 416 F.2d 776.

In State v. Novak (Mo.Sup.) 428 S.W. 2d 585, 591, this court reviewed the tests for probable cause for an arrest and stated: "Dealing with probable cause for arrest requires dealing with probabilities which are not technical but 'are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved. * * * Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed,' Brinegar v. United States, 338 U.S. 160, 175–176 [4], 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, and 'The substance of all the definitions (of probable cause) is a reasonable ground for belief of guilt,' Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543."

Arrests based upon information received from radio transmissions have been upheld by this court in State v. Craig, supra, and State v. Johnson, supra. In Craig, an arrest on the basis of a radio report giving brief description of the suspects, and suspect car, even though not entirely accurate, was upheld. Other recent cases upholding arrest based on descriptions received by officers from witnesses are State v. Stokes (Mo.Sup.) 387 S.W.2d 518; State v. Hill (Mo.Sup.) 419 S.W.2d 46; State v. Keeny (Mo.Sup.) 431 S.W.2d 95. In a recent federal case, Bailey v. United States, 128 U.S.App.D.C. 354, 389 F.2d 305, an arrest

and search incidental thereto were upheld based on a radio broadcast to look out for three male negroes in a 1953 blue Chevrolet wanted in connection with a robbery and assault in Washington, D. C. Shortly thereafter a police officer four miles from the scene observed a 1954 blue Chevrolet hardtop, occupied by four negro subjects and arrested the occupants forty minutes after the commission of the robbery and assault.

 In these days of high speed motor vehicles, where criminals can be sixty or more miles away from the scene of a crime within one hour after its commission, it is imperative that officers have the most modern means available (such as radio) to immediately disseminate descriptions of suspects and suspect vehicles to law enforcement officers in surrounding areas miles from the scene in order to identify and apprehend such law violators. As long as the apprehending officers have sufficiently reliable and trustworthy information to warrant a man of reasonable caution to believe that a criminal offense has been committed by the suspect, the arrest will stand the constitutional test.

The transmission of the information upon which trooper Mouser predicated the arrest was traced from the scene to the arresting officer. The Stephens reported a robbery by two "colored" men who made their "getaway" in the Stephens' white automobile. This automobile was found overturned and a bystander gave the police a description of the maroon Plymouth to which the suspects transferred. The information was transmitted by the radio dispatcher at Poplar Bluff and, in turn, by him to the apprehending and arresting officer.[1] The arresting trooper, after initially stopping the suspect vehicle after receiving the first communication, immedi-

---

1. The earlier stopping of the defendant, the search of the vehicle and the releasing of defendant by trooper Strayhorn is without significance in judging the validity of the arrest and search by trooper Mouser. Trooper Strayhorn's search apparently did not extend to the console, where trooper Mouser found the evidence.

ately contacted his headquarters and received (second transmission) the crime for which the suspect vehicle and occupants were wanted. The trooper sought additional information from a point where better radio reception could be obtained, three miles from the scene of the place of the original stopping and requested the suspects to follow him to such area. Upon receipt of a more complete description of the vehicle, and other details of the crime (third transmission), the formal arrest was made and the ensuing search revealed the fruits of the robbery and the shotgun used in the robbery. The time lapse between the initial stopping and the search was about five minutes. Had the trooper waited for more detailed information before initially stopping the suspect vehicle, the suspects' identity might never have been ascertained or the car might have sped into one of the neighboring jurisdictions and escaped detection. Bailey v. United States, 128 U.S. App.D.C. 354, 389 F.2d 305, 309. The "exigencies of the situation made [the police] course [of action] imperative." See McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. The United States Supreme Court said in Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782, " * * * The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential. * * *" So, too, in our case was speed essential if the suspected perpetrators of the armed robbery were to be captured. The emergency character of these arrests weighs heavily in determining their reasonableness. " * * * Common sense dictates, of course, that questions involving searches of motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason, what may be an unreasonable search of a house may be reasonable in the case of a motorcar." Preston v. United States, 376 U.S. 364, at 366–367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777.

The element of flight in a vehicle from the scene of the crime tips the scales here in favor of probable cause. Carroll v. United States, supra; Brinegar v. United States, supra; Bailey v. United States, supra.

We believe the constitutional test was met and the trial court's ruling, denying the motion to suppress and upholding the validity of the arrest and search incidental thereto, is sustained.

The next point of error raised, is that the trial court erred in permitting the state to file an amended information setting forth the prior conviction under the Habitual Criminal Act (Sec. 556.280, supra) and to endorse additional witnesses without counsel being present.

The state, under date of October 1, 1968, by letter, notified defense attorney of its intention to file an amended information charging the defendant under the Habitual Criminal Act and to endorse specific persons as additional witnesses on the next regular court day on October 10, 1968. On that day the court granted the state leave to file an amended information and to endorse additional witnesses. On November 14, 1968, the state did so. On November 20, 1968, defense announced ready for trial and no complaint was made relating to the amended information or to the endorsement of witnesses contained therein.

Criminal Rule 24.02, V.A.M.R., provides that the court may permit the amendment of an information at any time before verdict if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. The sole effect of the amendment was to allege the prior felony conviction. Leave of court was received before filing of the amended information. Defendant had notice of the amendment before trial, and admitted he had been convicted, sentenced and placed on probation at the trial. No additional or different offense was charged by the amended information and no rights of the defendant are shown to have been preju-

diced. State v. McCrady (Mo.Sup.) 416 S.W.2d 175, 177; State v. Crow (Mo.Sup.) 388 S.W.2d 817, 820.

The endorsement of additional witnesses was in compliance with Rule 24.17, V.A.M.R., after notice to defendant. The rule does not require the presence of the defendant or his counsel in court. As the defendant had more than two months' notice of the amended information and the endorsement of additional witnesses for the state, the defense has no standing to assert that he was prejudiced thereby. State v. Durham (Mo.Sup.) 418 S.W.2d 23.

In the next point raised by the defendant he alleges that the trial court prejudicially erred in receiving into evidence the testimony of Mrs. Stephens, relative to the treatment that she received by the defendant's accomplice, as such testimony was introduced by the state for the sole purpose of arousing passion in the minds of the jurors to the prejudice of the defendant.

It is held in this state that where two or more persons engage in a commission of a crime or crimes, proof of all relevant facts is generally proper. State v. Adams (Mo.Sup.) 380 S.W.2d 362, 368. In State v. Parr, 296 Mo. 406, 246 S.W. 903, at 905, where two different persons had been charged, the court said: " * * * Where, as here, two crimes are committed under such circumstances as to constitute one continuous transaction in the accomplishment of a common design, and the facts are so interrelated that the crimes are concurrent, proof of one cannot be made without a showing of the facts tending to establish the other. In short, the entire otherwise relevant facts may be regarded as part of the res gestae. State v. Sykes, 191 Mo. 62, 89 S.W. 851; State v. Katz, 266 Mo. loc. cit. 503, 181 S.W. 425. Without their admission, a connected and intelligible statement of the transaction could not well be made nor a clear understanding had of the same. * * *"

And see: State v. Mangercino, 325 Mo. 794, 30 S.W.2d 763, 765; State v. Lewkowitz, 265 Mo. 613, 178 S.W. 58, 64; State v. Allen (Mo.Sup.) 246 S.W. 946, 947; State v. Bell, banc, 359 Mo. 785, 223 S.W.2d 469, 471; State v. Johnson (Mo.Sup.) 347 S.W.2d 220, 222. All of the substantially simultaneous acts become part of the res gestae, State v. Adams (Mo.Sup.) 380 S.W. 2d 362, 368.

The evidence in this case showed that the defendant and his accomplice entered the Stephens' place together to commit a robbery. While the defendant concerned himself with Mr. Stephens, his accomplice forced Mrs. Stephens to the door of the Stephens' establishment to wave away a customer and ordered her to open the cash register and remove the money in the store area of the Stephens' place and then forced her to the living quarters, behind the store portion of the building, where the accomplice seized a wallet from Mrs. Stephens' pocketbook, the keys to the couple's Chevrolet, and two pistols. Both simultaneously fled from the scene together. This entire transaction, from the entry of defendant and his accomplice to the flight after the commission of the crime, took only a few minutes, and this evidence showed a single planned course of crime, and the entire picture is important in order to show the intent and willfulness of the actions of the defendant and his accomplice. This point is ruled against the defendant.

The final point alleged as prejudicial error is the trial court's failure to declare a mistrial when the prosecution asked the following question of the defendant. The record of the colloquy between the court, prosecution, and defense is set out as follows:

"Q You stated previously, Mr. Ward, that you were paroled? Why was your parole revoked?

MR. ESTES: Your Honor, I object to this. It is an improper question and he hasn't the right to ask such a question.

MR. POTASHNICK: Your Honor, I think he stated on direct his parole was revoked, Your Honor.

THE COURT: Just a minute.

MR. ESTES: He did not and I move for a mistrial.

THE COURT: The objection will be sustained.

MR. ESTES: At this point, Your Honor—

THE COURT: Wait a minute. We sustained the objection.

MR. ESTES: At this point I would like to move for a mistrial on the basis of the comments made by Mr. Potashnick that this man's parole was revoked, that there was no evidence of any such revocation of a parole, that if such occurred, it is inflammatory. The remark is inflammatory to the jury and it weighs heavily on the mind of the jury in arriving at a decision, and I request that a mistrial be declared on that basis.

THE COURT: Overruled."

 The declaration of a mistrial is a drastic remedy and the power of the trial court in this respect "should be exercised only in extraordinary circumstances", State v. James (Mo.Sup.) 247 S.W.2d 211, 214. "[A] mistrial should be granted only when the incident is so grievous that the prejudicial effect can be removed no other way." State v. Camper (Mo.Sup.) 391 S. W.2d 926, 928. The declaration of a mistrial necessarily and properly rests in the discretion of the trial court who observed the incident giving rise to tthe request for a mistrial, and who is in a far better position than an appellate court to evaluate the prejudicial effect and possibility of its removal short of a mistrial. The proper function of an appellate court in the matter before us is to determine whether as a matter of law the trial court abused its discretion in this instance. State v. Smith (Mo.Sup.) 431 S.W.2d 74, 82 [21–24].

When the objectionable question, based upon a misstatement of fact, was asked by the prosecutor, the court immediately sustained the defense objection, thus informing the jury that there was no basis for the prosecutor's question. Under the circumstances of this case the trial court did not abuse its discretion and this court finds no prejudicial error.

Judgment is affirmed.

HOLMAN, J., concurs.

SEILER, P. J., dubitante.

BARDGETT, J., not participating because not a member of the Court when cause was submitted.